**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

TULSA ZOO MANAGEMENT, INC.,

        Plaintiff,

v.

PECKHAM GUYTON ALBERS & VIETS,
INC.,

        Defendant.

Case No. 17-CV-644-GKF-FHM

<u>**OPINION AND ORDER**</u>

Before the court is the Substitute Combined Motion for Summary Judgment and Opening
Brief in Support [Doc. 53] of defendant Peckham Guyton Albers & Viets, Inc. (PGAV).  For the
reasons set forth below, the motion is granted in part and denied in part.

**I.    Background**

This is a breach of contract and professional negligence case arising from a surveying error
that occurred during the planning and construction of the Lost Kingdom project at the Tulsa Zoo.
The Zoo is owned by the City of Tulsa and has been managed by plaintiff Tulsa Zoo Management
Inc. (TZMI) since late 2010.  In March of 2012, TZMI adopted a twenty-year master plan to build
new exhibits and infrastructure and to improve guest experiences.  In 2011, TZMI hired PGAV—
an architectural and planning firm experienced in planning and designing zoo improvements—to
perform design services related to the master plan.  PGAV prepared the concept for the master
plan, including five independent large-scale projects addressing different areas of the Tulsa Zoo.

The first of the five major projects was an Asian-inspired exhibit complex known as the
Lost Kingdom.  PGAV's design for the Lost Kingdom exhibit imitated an ancient temple structure
overrun by nature, with various species of animals commonly found in Asia, including Malayan

tigers, snow leopards, Komodo dragons, and various indigenous Asian birds housed in an aviary. Designs for the Lost Kingdom required construction of new animal enclosures and the integration of an existing concession stand, the Trunk Stop. Additionally, the plan included a new structure, the Special Events Pavilion, with a dining area view of an outdoor tiger enclosure.

TZMI hired White Surveying Co. to perform the survey of the Lost Kingdom site that PGAV used to create design drawings for the project. The White survey contained elevation errors, and, as a result, the foundation for the Special Events Pavilion was poured with finished floor elevations below the required elevation of new construction in a flood plain. Additionally, the finished floor elevation of the Trunk Stop was approximately 2.5 feet lower than the new improvements.

TZMI settled with White and subsequently filed this case against PGAV for breach of contract and professional negligence. TZMI claims PGAV breached its contract and professional tort duties in three ways: (1) failing to notify TZMI of an inconsistency between the White survey and 2011 elevation certificates obtained by the City of Tulsa and provided to PGAV; (2) failing to exercise due care in advising TZMI of an inconsistency between the White survey and the Trunk Stop's original design drawings, prepared by Imel & Graber; and (3) failing to select NAVD 88 reference datum on the survey requirements form PGAV submitted to TZMI.

PGAV now moves for summary judgment on TZMI's claims or, alternatively, for partial summary judgment on three of its affirmative defenses regarding damages.

## II.    Evidentiary Issues

Before considering PGAV's motion for summary judgment, the court must address five evidentiary issues associated with TZMI's response. PGAV raised the first issue in its reply [Doc. 70], and the remaining four issues in its Objections to Plaintiff's Evidence Submitted in Opposition to Summary Judgment [Doc. 71].

A.  *Compliance with LCvR 56.1(c)*

PGAV argues in its reply that TZMI's response does not comply with Local Civil Rule 56.1, the local rule governing summary judgment procedure. [Doc. 70, pp. 1–2]. PGAV's motion for summary judgment offers seventy-nine (79) paragraphs of material facts which it asserts are undisputed. [Doc. 53, pp. 8–21]. The factual portion of TZMI's response has two parts: an eight-four (84) paragraph "Statement of Facts" section [Doc. 63, pp. 6-26], and an eight (8) paragraph "Disputed Facts" section [Doc. 63, pp. 26-27]. The "Statement of Facts" section does not state which of its paragraphs create a genuine issue of material fact or specify which of PGAV's material facts are in dispute. The "Disputed Facts" section identifies seven of PGAV's material facts that TZMI asserts are disputed—fact nos. 16 (fourth sentence), 29-30, 41, 69, 71, and 79—and states that TZMI disputes all of PGAV's material facts "to the extent they conflict" with TZMI's "Statement of Facts." [Doc. 63, p. 26, ¶¶ 85–92].

Local Civil Rule 56.1(c) provides that "[a]ll material facts set forth in the statement of the material facts of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party." LCvR 56.1(c). It is well-established that respondent bears the burden of ensuring that a factual dispute is portrayed with particularity, and the court "is not required to comb through Plaintiff[']s[] evidence to determine the bases for a claim that a factual dispute exists." *Bootenhoff v. Hormel Foods Corp.*, No. CIV-11-1368-D, 2014 WL 3810329, at *2 n.3 (W.D. Okla. Aug. 1, 2014) (citing *Mitchell v. City of Moore,* 218 F.3d 1190, 1199 (10th Cir. 2000)).

Under this rule, TZMI has "specifically controverted" only the seven facts identified as disputed in its "Disputed Facts" section—fact nos. 16 (fourth sentence), 29-30, 41, 69, 71, and 79. TZMI's statement that it disputes PGAV's material facts "to the extent they conflict" with its "Statement of Facts" would, as a practical matter, require the court to compare each of the 84

paragraphs in TZMI's "Statement of Facts" with each of PGAV's 79 material facts to detect potential conflicts. Such a burdensome procedure does not satisfy the particularity requirements of LCvR 56.1(c). *See Murphy*, 2018 WL 4088071, at *3. The court will therefore consider all but the following of PGAV's material facts to be undisputed for summary judgment purposes: fact nos. 16 (fourth sentence), 29-30, 41, 69, 71, and 79.[1]

Turning to the objections, PGAV also argues in several places that evidence presented in TZMI's "Statement of Facts" section should be disregarded. PGAV objects to the following evidence cited in TZMI's "Statement of Facts": (1) Scott Shope's Declaration [Doc. 63-30]; (2) Scott Shope's Deposition Testimony [Doc. 63-5]; (3) Tom Hayne's Deposition Testimony [Doc. 63-3]; and (4) Terrie Correll's Declaration [Doc. 63-20]. The court separately considers each objection.

B.      *Scott Shope's Declaration [Doc. 63-30]*

PGAV argues the court should disregard the declaration of TZMI vice president Scott Shope [Doc. 63-30] because it is an attempt to create a sham fact issue. [Doc. 71, pp. 1-7]. PGAV's material fact no. 79 states: "The new Trunk Stop has greater value than the old one."

---

[1] TZMI does not argue to the contrary and states:

> Here, TZMI has provided a "concise statement" of the facts it disputes from PGAV's motion. It's in a section of TZMI's response, conspicuously labeled "DISPUTED FACTS." That section fully complies with Local Rule 56.1. As the Court will see, TZMI doesn't dispute many of PGAV's facts. That's because the real problem with PGAV's motion is one of *omitting* material facts, rather than getting the facts wrong—although it certainly gets a few wrong. As a result, TZMI's response largely consists of *additional* facts, the lion's share of which do not specifically controvert anything in PGAV's motion.

[Doc. 77, p. 7] (emphasis in original).

[Doc. 53, p. 21, ¶ 79]. In support, PGAV cites the following portion of Shope's deposition testimony:

> **Q:** Do you have any understanding—do you have enough knowledge to say whether or not the new Trunk Stop is more valuable and better than the 20-year-old previous Trunk Stop?
>
> MR. WILSON: Object to the form.
>
> **A:** Can you repeat the question?
>
> **Q:** (By Mr. Wilson) Yeah.
>
> MR. WILSON: Could you restate it?
>
> (Whereupon, the court reporter read back the previous question.)
>
> **A:** I would say yes.

[Doc. 53-7, pp. 88:20 to 89:5]. The exchange continued:

> **Q:** (By Mr. Wilson) Okay. How so?
>
> **A:** Construction methods are more efficient now than they were back then. We could be saving money on utilities things like that.
>
> **Q:** Was there any added improvements to the current Trunk Stop that were not part of the old Trunk Stop?
>
> **A:** Still family restrooms on both sides still selling concessions.

[Doc. 53-7, p. 89:6-14].

As noted above, TZMI disputes PGAV's material fact no. 79. [Doc. 63, p. 27, ¶ 92]. In support, TZMI cites paragraph 8 of Shope's declaration:

> The problems created by PGAV's reliance on the survey required TZMI to demolish the existing Trunk Stop and replace it with a substantially similar structure that was built at a higher elevation. The new Trunk Stop was not appreciably larger or built of better materials, and it did not have different functionality. The previous Trunk Stop building contained restrooms, a cooking area, and a service counter. The new Trunk Stop likewise consists of restrooms, a cooking area, and a service counter. Other than the potential for savings on utilities as a result of more modern construction methods, the new Trunk Stop was not an "improvement" over the existing Trunk Stop.

[Doc. 63-30, pp. 2-3, ¶ 8].

Under the sham affidavit rule, courts will disregard an affidavit that conflicts with the affiant's prior sworn statements if it "constitutes an attempt to create a sham fact issue." *Wicks v. United States*, 304 F. Supp. 3d 1079, 1090 (N.D. Okla. 2018) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

> Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

*Id.* (quoting *Franks*, 796 F.2d at 1237). The sham affidavit rule "is generally not applied when there is independent evidence in the record to bolster an otherwise questionable affidavit." 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.94[5][c] (3d ed. 2014).

Here, PGAV has not shown that Shope's declaration is an attempt to create a sham fact issue. First, the sham affidavit rule does not apply because Shope's deposition is supported by independent evidence in the record. For instance, in contesting PGAV's material fact no. 79, TZMI also cites to deposition testimony from TZMI president Terrie Correll. [Doc. 63, p. 27, ¶ 92 (citing Doc. 63-7, 40:14-20, 42:1-25)]. Second, even if the rule did apply, Shope's declaration does not create a "clear, irreconcilable conflict" with his deposition testimony; rather the declaration simply clarifies in what sense Shope agreed that the new Trunk Stop was more "valuable and better" than the old one. *Durtsche v. Am. Colloid Co.*, 958 F.2d 1007, 1010 n.2 (10th Cir. 1992); *see also Cornaby's LLC v. Carnet, LLC*, Case No. 14-CV-00462-JNP, 2017 WL 1437063, at *3 (D. Utah Apr. 21, 2017) (rejecting sham affidavit argument where the affidavit did not directly contradict the deposition testimony). The court therefore declines to disregard Shope's declaration under the sham affidavit rule.

PGAV takes issue with several other aspects of Shope's declaration. [Doc. 71, pp. 4-7]. First, PGAV argues paragraph 9 should be entirely disregarded because it is cited in support of paragraph 60 of TZMI's Statement of Facts section, which "does not indicate which, if any, of PGAV's facts the statement is intended to controvert." [Doc. 71, p. 4]. Nothing prevents a plaintiff from attempting to show the existence of a genuine issue of material fact by offering additional facts. *See* FED. R. CIV. P. 56; LCvR 56.1; *see also* 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.70[5][c][i] (3d ed. 2014) ("The opposing party may also raise additional facts, with specific citations to the evidentiary record, that the opposing party claims are relevant to resolution of the motion."). Although paragraph 60 does not specifically controvert any specific undisputed fact offered by PGAV, TZMI may offer additional material facts—facts omitted by PGAV—to demonstrate that a genuine dispute of material fact exists with respect to an element of its claim such that PGAV is not entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). If the rule were not so, a movant could obtain summary judgment simply by omitting material facts.

PGAV also accuses Shope's declaration of being self-serving, conclusory, and lacking foundation. The mere fact that evidence is favorable or self-serving to a party does not render it inadmissible. *See Fed. Trade Comm'n v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085, 1096 n.20 (D. Kan. 2011); *see also* 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.94[3] (3d ed. 2014) ("[T]here is nothing wrong with self-serving affidavits and declarations, provided they are supported by the facts in the record and satisfy the usual requirements for affidavits and declarations.").

However, conclusory affidavits are insufficient to preclude summary judgment. *See Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). An affidavit is conclusory if it draws inferences.

7

*Servants of the Paraclete, Inc. v. Great Am. Ins. Co.*, 866 F. Supp. 1560, 1565 (D.N.M. 1994).

The Tenth Circuit's prohibition against conclusory affidavits arises from Rule 56's requirement that an affidavit used to oppose summary judgment "be made on personal knowledge" and "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). Paragraph 9 consists of six (6) sentences, four sentences of which are contested, and the court separately analyzes each contested sentence.

The first sentence of paragraph 9 states "[t]he new Trunk Stop was a substantial, unexpected expense, and would not have been necessary in the absence of PGAV's reliance on the survey." [Doc. 63-30, p. 3, ¶ 9]. Shoppe's declaration establishes that he was employed by TZMI, first as the Director of Facilities and Grounds, then as the Vice-President of Facilities and Construction [Doc. 63-30, p. 1, ¶ 1]; that, as such, he was involved in many aspects of the planning and implementation of the Lost Kingdom project for which PGAV served as architect [*Id.* ¶ 2]; that from the beginning of the Lost Kingdom project, TZMI communicated to PGAV that it intended to integrate the Trunk Stop into the Lost Kingdom in an effort to save money and resources [*Id.* ¶ 3]; and that problems created by reliance on the erroneous survey resulted in replacement of the Trunk Stop [*Id.* pp. 2-3, ¶ 8]. As a TZMI employee "involved in many aspects" of the Lost Kingdom, Shoppe unquestionably had knowledge of expenses incurred by TZMI to construct the new Trunk Stop.

PGAV contends "no foundation has been laid for Shope to testify as to this subject involving causation." [Doc. 71, p. 5]. However, paragraph 9 follows averments that "[a]s construction on the Lost Kingdom project progressed, it became clear that PGAV had relied on an inaccurate survey in developing its plans for the project," as a result, "[t]he existing Trunk Stop, which was below the flood plain to begin with, was at an even lower elevation than the rest of the

already partially constructed Lost Kingdom," and the disparity required modification to comply with ADA requirements, the predicted cost of which "made it impossible to preserve the existing Trunk Stop." [Doc. 63-30, p. 2, ¶¶ 6-7]. PGAV does not specifically object to these averments. Further, as previously stated, the affidavit establishes Shope's involvement in the planning and implementation of the Lost Kingdom project. [*Id.* p. 1, ¶ 2]. When read in context, the declaration provides sufficient factual basis for Shope's statement and the court concludes sufficient foundation exists to establish that paragraph 9 reflects matters of which Shope would have personal knowledge based on his own observations and experiences during his employment.

The second and third sentences of paragraph 9 state as follows: "In the summer of 2012, during the planning phase for the Lost Kingdom, before PGAV received the inaccurate survey, PGAV had knowledge of the true elevation of the Trunk Stop," and "PGAV recognized that the Lost Kingdom design it was working with at the time would not accommodate the Trunk Stop's true elevation." [Doc. 63-30, p. 3, ¶ 9]. PGAV again asserts a foundation objection, arguing TZMI has not established the foundation for Shope to testify to *PGAV's* knowledge or recognition of the Trunk Stop's true elevation. [Doc. 71, p. 6]. However, the declaration includes citation to specific evidence in the record to support Shope's statements, which themselves are admissible evidence. *See* [Doc. 62-1, pp. 7-33]. Thus, sentences two and three satisfy the requirements of Rule 56 and are not "conclusory."

Finally, PGAV contends the court must disregard the sixth (and last) sentence of paragraph 9 as a "baseless conclusion."[2] In the sixth sentence, Shope declares ". . . after it received the inaccurate survey, PGAV discarded the alterations and reverted to a design that, based on the true elevation of the Trunk Stop, would ultimately not allow the Trunk Stop to be retained." [Doc. 63-

_____

[2] PGAV does not object to the fourth or fifth sentence of paragraph 9. *See* [Doc. 71, pp. 4-6].

30, p. 3, ¶ 9]. TZMI cites no evidence in the record to support the sixth sentence. Nor does the declaration include any other factual averments from Shope, a *TZMI* employee, regarding his knowledge of PGAV's decision making after discovery of the inaccurate survey. Thus, the court is not persuaded that the last sentence of paragraph 9 reflects information known to Shope through his own experience at TZMI or derived from his personal observation. Rather, the last sentence of paragraph 9 is an impermissible inference, which the court does not consider.

PGAV also argues Shope has no foundation to testify to the facts contained in paragraphs 10 and 11 of his declaration. Paragraphs 10 and 11 are not cited in TZMI's response, and PGAV's objection as to them is therefore moot. To the extent that TZMI relies on paragraphs 10 and 11 in objecting to PGAV's motions *in limine*, the court will consider PGAV's objections in ruling on those motions.

C.    *Shope's Deposition Testimony [Doc. 63-5]*

PGAV next objects to a portion of Shope's deposition testimony claiming it contains hearsay and inadmissible lay opinion testimony.[3]   [Doc. 71, pp. 7-8]. The relevant deposition states as follows:

> **Q:**    And what problem or problems prevented, from what your recollection was, prevented preserving the Trunk Stop?
>
> **A:**    Initially we ran into diminished seating, diminished view shed. We tried to work around that. ADA compliance was pretty much the nail in the coffin. For it to be ADA compliant and the ramp that we had to construct, it had two issues. Number one, when I contacted Gary Schellhorn, the Director for Special Projects for the City of Tulsa, can I exclude that ramp and all of that work to get to the building from the cost incurred against the 50 percent value of that building. And he said, no, you cannot. It has to—it's part of it because it feeds the building. It's required to and attaches to. I said, okay. . . .

---

[3] These arguments are also raised in PGAV's third motion *in limine*, which PGAV incorporates by reference. [Doc. 71, p. 7] (citing [Doc. 49 and Doc. 67]).

**Q:**    Let me go back to the very first one you raised and that's the 50 percent threshold.

**A:**    Yes.

**Q:**    If you exceed the 50 percent in costs over the lifetime of the building.

**A:**    Yes.

**Q:**    You can't remodel. You've got to do something else. Usually rebuild?

**A:**    Yes.

**Q:**    Had somebody done any costs evaluation for the ramp and for the other contemplated improvements to the existing Trunk Stop and came up with we're going to exceed 50 percent?

**A:**    Yes, it was obvious just a few modifications we were definitely going to exceed 50 percent, but the ramp was a pretty big one.

[Doc. 63-5, pp. 129:24 to 131:19].

The court first considers PGAV's hearsay objection. PGAV argues Shope's testimony regarding Schellhorn's statement that the cost of an ADA-compliant ramp could not be excluded from the substantial improvement calculation is inadmissible hearsay. [Doc. 71, p. 7; *see also* Doc. 49]. In response, TZMI asserts it is asking the court to consider Schellhorn's statement for its impact on TZMI's decision-making process regarding the feasibility of modifying the Trunk Stop—not the truth of the matter asserted. [Doc. 77, p. 9].

TZMI cites Shope's deposition testimony to support ¶ 73 in its "Statement of Facts" section which states:

> *While evaluating the feasibility of these modifications*, TZMI was notified by City officials that any such changes, including any ADA ramps, would count towards the City's monetary limit on improving existing structures within a floodplain. At the time, the total cost of the changes needed to salvage the Trunk Stop were well in excess of that limit.

[Doc. 63, p. 24, ¶ 73 (emphasis added)]. Paragraph 73 is immediately followed by ¶ 74, which states, in part, "*[f]or the foregoing reasons*, TZMI ultimately determined that its only viable option was to demolish the Trunk Stop and rebuild it at an elevation matching the rest of Lost Kingdom."

[*Id.* ¶ 74 (emphasis added)].  When read in context, the court agrees that, for purposes of summary judgment, TZMI offers Shope's testimony regarding his conversation with Schellhorn for its effect on the listener and therefore the prohibition against hearsay is inapplicable.

PGAV also objects to Shope's testimony that the cost of an ADA-compliant ramp would have exceeded fifty percent (50%) of the market value of the Trunk Stop as impermissible lay opinion.  It is well-established that a property owner is competent to testify regarding the reasonable market value of the owner's real property.  *Poteete v. MFA Mut. Ins. Co.*, 527 P.2d 18, 21 (Okla. 1974) ("An owner of property is not required to prove his qualifications in order to testify as to the value of property in the same degree as a stranger . . . . An owner is competent to testify as to his opinion as to the value of his property . . . , but his opinion is not conclusive."); *State ex rel. St. Highway Comm'n v. Johnson*, 563 S.W.2d 100, 103 (Mo. Ct. App. 1978).  The general rule "rests on the assumption that [the owner] is particularly familiar with the characteristics of the land as well as its actual and potential uses."  *Cohen v. Bushmeyer*, 251 S.W.3d 345, 349 (Mo. Ct. App. 2008); *see also Minick v. Rhoades Oil Co.*, 533 P.2d 598 (Okla. 1975) (requiring familiarity with the property and purposes for which it may be used).

PGAV asserts the general rule is inapplicable because the City of Tulsa, not TZMI, owns the Zoo's real property.  PGAV cites *United States v. Easements & Rights-of-Way Over a Total of 15.66 Acres of Land, More or Less, in Gordon, Cnty.*, 315 F. Supp. 3d 1353, 1363 (N.D. Ga. 2018), in support of a broad prohibition of testimony regarding fair market value by non-owners.  However, in that case, the witness, the owner's daughter, purported to base her testimony on familiarity with property in close proximity to the subject property, not familiarity with the subject property itself.  *Id.* at 1361.  Here, TZMI is necessarily familiar with the Zoo's real property through its management of the Zoo's operations.  TZMI has been responsible for the management

of the Zoo's operations since the Zoo's privatization in 2010. As property manager for the Zoo, TZMI is necessarily familiar with the Zoo's real property and its potential uses. In fact, TZMI adopted and began implementing a long-term plan to update and improve the Zoo's facilities, infrastructure, and exhibits—including the Lost Kingdom. Thus, the principles underlying a property owner's competence to testify regarding property's market value equally apply to TZMI as a property manager and the *Easements and Rights-of-Way* decision is unpersuasive. The court applies the general rule under these facts.

> D. *Tom Haynes' Deposition Testimony [Doc. 63-3]*

Next, PGAV objects to a portion of deposition testimony by White Surveying Co. president Tom Haynes. [Doc. 71, pp. 8-9]. In ¶ 37 of its "Statement of Facts" section, TZMI states:

> During his deposition, Haynes testified that he would have performed the survey using NAVD 88 datum [*sic*] had PGAV requested it on it [*sic*] Survey Requirements form.

[Doc. 63, p. 14, ¶ 37]. In support, TZMI cites the following deposition testimony by Haynes:

> **Q:** Okay. If the survey requirements form had said to use NAVD '88 datum, what would you have done differently?
>
> MR. DRAKE: Object to the form.
>
> **A:** Considerably different. At that point we would have had to tie into a known NGVD monument that has an established elevation on it. Generally we used two control points, that and then transfer that elevation back to the site.
>
> **Q:** (By Mr. Fitzgerald) So to put it in simple terms, if PGAV's survey requirements form had said to use the NAVD '88 datum, that's exactly what you would have used?
>
> MR. DRAKE: Object to form.
>
> **A:** Exactly.
>
> **Q:** (By Mr. Fitzgerald) I'm sorry. Let me—let's do that again because it gets covered up. So I'll ask it, he'll answer—he'll say his objection, and then you can answer.
>
> **A:** I'm sorry.

**Q:** Oh, I know.  This is not—

MR. CONNELL:  Long day.

**Q:** (By Mr. Fitzgerald)  And you're not used to this.  I understand.  So to put it simply, if PGAV's survey requirements form had instructed—given the instruction to use the NAVD '88 datum, then that's exactly what you would have done?

MR. DRAKE:  Object to form.

**A:** Yes, sir.

[Doc. 63-3, 140:3–141:7].

PGAV argues Haynes should not be allowed to speculate about what he would have done had PGAV's survey requirements form requested NAVD 88 datum.  The court disagrees.  "The but-for test of causation can be applied only by comparing what happened with a hypothetical alternative."  Dobbs' Law of Torts § 187; *RWB Servs., LLC v. Hartford Comput. Grp., Inc.*, 539 F.3d 681, 686 (7th Cir. 2008) ("The typical question asked in determining cause-in-fact is counterfactual: would the claimed injury still have happened if the defendant had not engaged in the tortious conduct alleged?").  Haynes is competent to testify to what he would have done had PGAV requested NAVD 88 datum, and it is not speculation for him to testify to the counterfactual.  *See LaFlamme v. Rumford Hosp.*, No. 13-CV-460-JDL, 2015 WL 4139478, at *6 n.14 (D. Me. July 9, 2015) ("The statements are not based on speculation. They relate what the plaintiff avers she would have told Carlton had she reached her.").

PGAV also objects to TZMI's questioning of Haynes as leading.  TZMI's first question was open-ended and was proper.  However, the second and third questions were leading, and Haynes may not fairly be regarded as a hostile witness to TZMI or a witness identified with an adverse party pursuant to Fed. R. Evid. 611(c)(2), as White settled its dispute with TZMI.  PGAV's objection is overruled as to the first question but sustained as to the second and third.

E.     *Terrie Correll's Declaration [Doc. 63-20]*

PGAV's final objection is to the declaration of TZMI president Terrie Correll.  [Doc. 71, pp. 9-10].  PGAV argues ¶¶ 5–6 of Correll's declaration contain inadmissible parol evidence regarding TZMI's contractual obligations under an Interlocal Agreement with the City of Tulsa and also constitutes an improper legal conclusion.[4]  PGAV—as a nonparty to the Interlocal Agreement—may not invoke the parol evidence rule.  *See Dawson v. Cobb,* 42 P.2d 269 (Okla. 1935); *Fulton v. L & N Consultants, Inc.,* 715 F.2d 1413, 1418 (10th Cir. 1982) ("The general rule in Oklahoma is that the parol evidence rule only applies to parties to the agreement and their privies."); *Robson v. Diem*, 317 S.W.3d 706, 713 (Mo. Ct. App. 2010) ("The rule excluding extrinsic evidence sought to be introduced for the purpose of affecting a written instrument is applied only where the controversy is between the parties to the instrument or to their privies.") (quoting *Am. Bank v. Wegener*, 776 S.W.2d 922, 925 (Mo. Ct. App. 1989)).

With respect to PGAV's objection to ¶¶ 5-6 as legal conclusions, for purposes of summary judgment, the court construes the paragraphs as factual statements.  The Interlocal Agreement expressly states that the City "appropriated certain funds for the Project"—$3,749.824.00—"but the amount appropriated is less than the total cost to complete the City's portion of the Project." [Doc. 63-20, p. 5].  Accordingly, TZMI agreed to provide up to $704,683.07 in funding to complete the project.  [*Id.*].  The court considers Correll's declaration only for the factual proposition that the cost of construction for the City's portion of the project exceeded the appropriated funds in

---

[4] PGAV does not dispute the authenticity of the Interlocal Agreement.  *See* [Doc. 63-20, pp. 5-7]. The Interlocal Agreement provides, in part, as follows:  (1) TZMI and the City of Tulsa jointly planned construction of the Lost Kingdom project, where the City's portion of the Project includes site demolition, excavation and grading, utility services, and construction of a Special Events Pavilion; (2) the City appropriated certain funds for the Project but the amount appropriated was less that the total cost necessary to complete the Project; and (3) TZMI agreed to provide funding to complete the City's portion of the Project.  [*Id.* p. 5].

February 2016 and thereafter TZMI provided funds to complete the project. PGAV's objections to ¶¶ 5-6 are overruled.

PGAV also objects to ¶ 9 of Correll's declaration, citing hearsay and lack of personal knowledge. Paragraph 9 states:

> TZMI could not settle with White Surveying without resolving Atlas's unpaid claim. White Surveying insisted that it be protected from claims that might be asserted by construction companies, like Atlas. Accordingly, White Surveying required TZMI, as a condition of settlement, to obtain releases from the City, Atlas, and Nabholz Construction.

[Doc. 63-20, p. 2, ¶ 9]. PGAV argues this paragraph contains "hearsay testimony about what White demanded from TZMI as a condition of settlement." [Doc. 71, p. 10]. In response, TZMI argues the statements from White are not being offered for the truth of the matter asserted because "[i]t doesn't matter what, deep down, White Surveying *really* meant it [*sic*] when it 'insisted that it be protected' from third-party claims. That's not the issue. Rather, what matters is that White Surveying *did* insist on it and that statement had a very real effect on TZMI." [Doc. 77, p. 13 (emphasis in original)].[5] TZMI's argument is a distinction without a difference. TZMI concedes that it offers the statements for the truth that White did, in fact, insist on being protected. *Id.* [("Rather, what matters is that White Surveying did insist on it . . . ."). Thus, Correll's declaration includes impermissible hearsay and the court disregards Correll's averment that "White Surveying insisted that it be protected from claims that might be asserted by construction companies, like Atlas," and "required TZMI, as a condition of settlement, to obtain releases from the City, Atlas, and Nabholz Construction." [Doc. 63-20, p. 2, ¶ 9].

---

[5] Notably, TZMI offers no evidence from White that it "insisted on" protection from third-party claims, including Atlas.

Finally, PGAV objects to paragraphs 4 and 10 of Correll's declaration, arguing Correll failed to establish sufficient personal knowledge because she does not indicate that she personally made the decision. In response, TZMI submits a supplemental declaration of Correll that explains her personal participation in the TZMI's Board of Director's decision to continue to pay PGAV, settlement negotiations with White, and Board discussions regarding the settlement with Atlas. The court has discretion to permit supplemental affidavits it finds useful for summary judgment determinations. *See Lighton v. Univ. of Utah*, 209 F.3d 1213, 1227 (10th Cir. 2000). Correll's supplemental affidavit sufficiently establishes her personal knowledge of the matters contained in paragraphs 4 and 10 of her original affidavit. Further, even if the court did not consider the supplemental affidavit, "[p]ersonal knowledge may be inferred from [Correll's] position[.]" *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1201 (C.D. Cal. 2007) (collecting cases).

## III. Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted). In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law*." Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986).

## IV.    Undisputed Material Facts

The court finds the following facts undisputed for summary judgment purposes:

In 2011, TZMI hired PGAV to prepare the Zoo's master plan. The master plan recommended developing the Lost Kingdom first—a showcase for tigers, snow leopards and other rare animals. The BOK Pavilion and the Trunk Stop, a concession stand built in 1995, were located within the Lost Kingdom area. [DSOF ¶ 4]. While preparing the Master Plan, PGAV obtained information from TZMI about the Zoo, including a sparsely detailed site map. [DSOF ¶ 5]. PGAV vice president John Kemper described the site map as a partial survey, and noted it misstated the Trunk Stop's horizontal location. [DSOF ¶ 6; Doc. 53-10, p. 68:3-15].

In April of 2012, TZMI as "Owner" and PGAV as "Architect" entered into a contract [Doc. 53-26] for PGAV to perform schematic design services for the Lost Kingdom project. [DSOF ¶ 7]. The contract included the following relevant terms:

- **§ 2.2**   The Architect shall perform its services consistent with the professional skill and care ordinarily provided by architects practicing in the same or similar locality under the same or similar circumstances . . . .

- **§ 3.1.2**   The Architect shall coordinate its services with those services provided by the Owner and the Owner's consultants. The Architect shall be entitled to rely on the accuracy and completeness of services and information furnished by the Owner and the Owner's consultants. The Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any error, omission or inconsistency in such services or information.

- **§ 3.2.1**  The Architect shall review the program and other information furnished by the Owner, and shall review laws, codes, and regulations applicable to the Architect's services.

- **§ 5.4**  The Owner shall furnish surveys to describe physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site.  The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; designated wetlands; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, and deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data with respect to existing buildings, other improvements, and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a Project benchmark.

- **§ 8.1.3**  The Architect and Owner waive consequential damages for claims, disputes or other matters in question arising out of or relating to this Agreement, including without limitation claims for lost profits, loss of revenue, lost rentals or other loss of use damages . . . .

- **§ 10.1**  This Agreement shall be governed by the substantive law of the State of Missouri without the application of choice of law rules . . . .

[DSOF ¶ 8]; *see also* [Doc. 53-26, pp. 3-5, 12, and 17].  In July of 2013, TZMI and PGAV entered into a second contract for PGAV to perform additional design services for the Lost Kingdom project.  [DSOF ¶ 36].  The material terms of the April 2012 contract and July 2013 contract are the same.  [Doc. 14-1, pp. 5-32; Doc. 53-26].[6]

According to flood insurance rate maps issued by Federal Emergency Management Agency (FEMA), the Zoo is located in a floodplain and has a base flood elevation of 594' based on NAVD 88 datum.[7]  [DSOF ¶ 10].  The City of Tulsa requires the minimum elevation of the lowest floor

---

[6] It should be noted § 5.4 in the April 2012 agreement is numbered § 5.6 in the July 2013 agreement.  For ease of reference and because the material terms are the same, the court will hereinafter refer to the April 2012 contract and July 2013 contract, collectively, as "the Agreement."

[7] By way of background, land surveyors determine elevation by measuring from a known elevation point or group of points, referred to as vertical datum.  This can be done using local reference

of any new construction or substantial improvement of a non-residential structure located in a floodplain to be one foot above the base flood elevation, absent flood proofing or the grant of a variance. [DSOF ¶ 11 (citing Doc. 53-46, Certified Code of Ordinances, Title 11-A, § 301(B)(43) and Doc. 53-47, Certified Code of Ordinances, Title 11-A, § 304(E)(2)(b)(2))].

At TZMI's request, PGAV prepared a "Survey Requirements" form for the Lost Kingdom project dated July 6, 2012. [DSOF ¶ 12]. An architectural designer for PGAV, Ashley Schumake,[8] filled out the form, and the project architect for the Lost Kingdom, Mariusz Bleszynski, reviewed it to see if it satisfied PGAV's needs. The form requested a topographical survey using reference datum "[c]onsistent with previous surveys." [*Id.*]. This made sense to Kemper and Bleszynski because TZMI's rhino construction project, then underway, required a survey. [*Id.*]. PGAV requested a copy of that survey, but never received one. [*Id.*].

On July 10, 2012, Kemper emailed the completed "Survey Requirements" form to TZMI president Terrie Correll. [DSOF ¶ 13]. Kemper's email stated:

---

points, called "local datum" or "local control," or one of two nationwide systems—the National Geodetic Vertical Datum of 1929 (NGVD 29) or the North American Vertical Datum of 1988 (NAVD 88). *See* [Doc. 63-4, pp. 22:1 to 25:22; NGVD→NAVD, FEMA (Mar. 20, 2007), https://www.fema.gov/media-library-data/20130726-1755-25045-0634/ngvd_navd.pdf.].

[8] Ashley Schumake's name is now Ashley Maul. She was unmarried for the time period relevant to this case, so the court will refer to her by her maiden name—Schumake. *See* [Doc. 53, p. 8 n.2].

| Message | |
|---|---|
| From: | John Kemper [john.kemper@pgav.com] |
| Sent: | 7/10/2012 10:55:18 AM |
| To: | Terrie Correll [/O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=TCORRELL] |
| CC: | Holly Becker [/O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=HOLLY]; Jennifer O'Neal [/O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=JONEAL]; Scott Shope [/O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=SSHOPE]; Ashley Schumake [ashley.schumake@pgav.com]; Lydia Passmore [lydia.passmore@pgav.com]; Stacey Tarpley [stacey.tarpley@pgav.com]; Jim Wible [jim.wible@pgav.com] |
| Subject: | FW: Survey Request Information 75859-00 |
| Attachments: | 76859-X02.P00_site_survey.pdf; 76859-X02.P00_site-survey2.pdf; 20120706_Survey_Requirements.pdf; LKT TreesOnSite002.pdf; TZI - GoogleEarth- Trees.JPG |

Terrie,

Per our call last week, attached is the information we believe is necessary for soliciting bids for survey work on the Lost Kingdom site.

If there is someone on your staff that is knowledgeable of surveys (Scott maybe?), they should review the Survey Requirements document to make sure it is consistent with previous requests.  And, you might review the suggested boundary of the survey for other, unrelated purposes you may have.

As well, if you know that any existing surveys overlap into this area, they should be shared with the bidders.

Let us know if you need further assistance.

[Doc. 53-24, p. 1].  TZMI's director of operations, Scott Shope, reviewed Kemper's email, but did not take any steps to see if PGAV's stated survey requirements were consistent with prior Zoo surveys.  [DSOF ¶ 14].  TZMI had not previously ordered any surveys, but no one from TZMI informed PGAV of that fact.  [DSOF ¶ 15].

In July of 2012, TZMI submitted a request for quotes to White Surveying Co. and other surveying firms.  [DSOF ¶ 16].  Thereafter, Correll took Tom Haynes of White on a tour of the Zoo to discuss the survey needs.  [*Id.*].  Correll identified the area to be surveyed and indicated the survey should not be inconsistent with elevations and locations of a particular walkway.  [*Id.*].  One of the locations Haynes and Correll visited during the tour was a feature known as the Bamboo Circle.   [*Id.*; Doc. 63-3, pp. 41:6-22 and 137:18 to 139:17].[9]   From their discussion, Haynes

---

[9] TZMI disputes the fourth sentence in PGAV's material fact no. 16, which reads:  "Correll and Haynes traveled to Bamboo Circle (located east of the Trunk Stop), *and Correll noted that location as the control point for the survey*."  [Doc. 63, p. 26, ¶ 86 (emphasis added)].  In support—and as clarified by TZMI's errata sheet [Doc. 75]—TZMI cites to Haynes' statement during his deposition that Correll did not tell Haynes to use the Bamboo Circle as a reference point; she did not use the term control point; and that she did not tell him to use Bamboo Circle as a control point. [Doc. 63-3, p. 138:3-15].  PGAV argues in its supplemental reply brief that the cited evidence does not controvert the above sentence.  [Doc. 80, p. 1].  The court finds that a genuine issue of material

understood that previous Zoo survey work was keyed on Bamboo Circle, that the Bamboo Circle was the reference point used in prior surveys, and that White should establish its benchmark there. [DSOF ¶ 16]. Haynes did not receive a prior survey of the Zoo. [DSOF ¶ 17].

TZMI subsequently forwarded PGAV's survey requirements form to White [Doc. 63-3, 42:3 to 43:8],[10] and engaged White to perform the surveying services after receiving White's July 25, 2012 proposal. [DSOF ¶ 18]. White used a GPS device to determine the elevation and position of the control point, i.e., its initial benchmark or "local control," established near the Bamboo Circle. [DSOF ¶ 19]. In determining elevations, White did not use NGVD 29 or NAVD 88 datum. [*Id.*].

On September 7, 2012, TZMI forwarded a copy of White's initial survey to PGAV in Auto cad format. [DSOF ¶ 21]. This initial survey did not contain any certification or seal by a licensed surveyor. [*Id.*]. By October of 2012, TZMI had also given PGAV the original design drawings for the Trunk Stop and the Pavilion, which were prepared in 1995 by an architecture firm named Imel & Graber. [DSOF ¶ 22]. In early November of 2012, Schumake was inputting design data into an electronic design file for the Trunk Stop to incorporate the layout, dimensions, and other features into the Auto Cad database. [DSOF ¶ 23]. For this purpose, she utilized the 1995 design drawings and the White survey. [*Id.*]. While inputting data, she noticed that the survey reported the finished floor elevation for the Trunk Stop as 594.94', 595', and 595.61', and for the Pavilion as 594.37', 594.92', and 594.92', but that the Imel & Graber design drawings stated the finished

---

fact exists as to PGAV's assertion that Correll "noted [Bamboo Circle] as the control point for the survey."

[10] PGAV acknowledges in its supplemental reply brief that Haynes' meeting with Correll occurred before PGAV sent Haynes the "Survey Requirements" form. [Doc. 80, p. 1].

floor elevations for the Trunk Stop and Pavilion were designed to be 592.53' and 592.5', respectively—around 2.5' to 3' lower. [*Id.*].

Schumake informed Bleszynski and Kemper of what she found. Bleszynski and Schumake knew the importance of correct elevation information and recognized that PGAV should notify TZMI of the elevation discrepancy. [DSOF ¶ 24]. On November 8, 2012, with Bleszynski's assistance, Schumake prepared and sent the following email to Shope:

**From:** Ashley Schumake [mailto:ashley.schumake@pgav.com]
**Sent:** Thursday, November 08, 2012 3:24 PM
**To:** Scott Shope
**Cc:** John Kemper; Lydia Passmore; Jim Wible; Mariusz Bleszynski
**Subject:** TZMI Survey

Scott,

I was comparing the new site survey that we receive from you in CD form with the existing Trunk Stop drawings that you mailed to us, and it seems that there is a discrepancy of what the finished floor elevation is. The site survey is showing that the Trunk Stop elevation is +595.5, while the existing drawings show +592.5. Do you know which I should base our CAD drawings off of?

Thanks for your help,

Ashley Schumake
PGAVDESTINATIONS.com

[DSOF ¶ 25; Doc. 53-21]. When Shope read Schumake's email, he knew that she was comparing the elevation on the White survey with the elevation on the older design drawings. [DSOF ¶ 26]. Shope responded fourteen minutes later:

**From:** Scott Shope [mailto:sshope@tulsazoo.org]
**Sent:** Thursday, November 08, 2012 3:38 PM
**To:** Ashley Schumake; Terrie Correll; Joe Barkowski
**Cc:** John Kemper; Lydia Passmore; Jim Wible; Mariusz Bleszynski
**Subject:** RE: TZMI Survey

Ashley,

I would utilize the new site survey from White Surveying Company. I looked at their actual drawings and confirm the finished floor at Trunk Stop is +595.5. That is the elevation to base the CAD drawings off of. Please let me know if I can offer any other assistance.

Thanks,

SCOTT SHOPE
*OPERATIONS MANAGER*
TULSA ZOO MANAGEMENT, INC.
™01 E. 36TH ST. NORTH
.JLSA, OK 74115
.J18) 669-6227
WWW.TULSAZOO.ORG

[DSOF ¶ 27; Doc. 53-21]. Both Bleszynski and Schumake wanted to ensure that Shope understood

the details of the differences detected, so Schumake emailed Shope back thirty minutes later and

added Correll to the email chain:

**To:** Scott Shope[sshope@tulsazoo.org]; Terrie Correll[tcorrell@tulsazoo.org]; Joe Barkowski[jbarkowski@tulsazoo.org]
**Cc:** John Kemper[john.kemper@pgav.com]; Lydia Passmore[lydia.passmore@pgav.com]; Jim Wible[jim.wible@pgav.com];
Mariusz Bleszynski[mariusz.bleszynski@pgav.com]
**From:** Ashley Schumake
**Sent:** Thur 11/8/2012 4:06:06 PM
**Subject:** TZMI Survey 75859-00

Great thanks Scott. I want to verify that the flood elevation is in fact +594. We would like for all finish floor elevations to be at least 1'
above flood level.

White Surveying Company:
-Trunk Stop Finish Floor Elevation - varies between +594.9 and +595.6  (existing drawings by Mel and Graber show +592.53)
-BOK Pavilion Finish Floor Elevation – varies between + 594.7 and +594.9 (existing drawings by Mel and Graber show +593)

[DSOF ¶ 28; Doc. 53-21].

Shope did not reply to this email.  He explained why in his deposition:

I remember looking at this email and then looking at John Kemper and Lydia and
Jim and Mariusz, and they were copied in and no one had any issues with it.  And
I said, well I've already answered this once.  I guess we're moving forward with
the new survey and that's what we did.

[DSOF ¶ 29; Doc. 53-7, p. 61:2-8].  Shope assumed the Imel & Graber design drawings were not

followed, meaning the floor was built three feet higher than designed.  [DSOF ¶ 32].  He instructed

PGAV to use the White survey because Zoo features were not built to design drawings and White

was a licensed surveying firm.  [*Id.*].

When asked if he had any misgivings with Shope's directive to utilize the White survey,

Bleszynski testified:

I did not.  This was client's directions.  I thought we fulfilled our efforts of searching
and communicating, and we are not able to verify this information as we do not—
we cannot survey.  We do not have equipment or knowledge.  We have to rely on
information provided to us by the client.  And Mr. Shope did sound on more than
one occasion very convinced that the new survey is accurate and can be relied on.

[DSOF ¶ 31; Doc. 53-18, p. 113:4-18].

Correll reviewed the November 8, 2012, emails, but the inconsistency did not suggest a

survey error to her.  [DSOF ¶ 33].  She knew that Zoo improvements did not match what was

designed. [*Id.*]. Correll added that it was reasonable to her to rely on the White survey because it was new and used available technology. [*Id.*]. TZMI made no further inquiry to White and did not otherwise look into the matter. [DSOF ¶ 34].

In April of 2013, the need arose to extend the survey eastward. [DSOF ¶ 35]. At TZMI's request, White issued a revised survey in June of 2013, which TZMI subsequently forwarded to PGAV. [*Id.*]. The reported elevations for the Trunk Stop and Pavilion did not change. [*Id.*]. The general notes on the survey state that the project is in a floodplain, and "[e]levations shown hereon are based on NAVD 88 datum." [*Id.*; Doc. 53-30, p. 4].

The White survey was signed and sealed in April of 2014 by Haynes, an Oklahoma registered land surveyor. The survey included the general notes and stated:

> White Surveying Company . . . and the Undersigned, a registered professional land surveyor, do hereby certify to:
> Tulsa Zoo Management, Inc.
> That: This topographic survey plat is a true and accurate representation of the topographic features situated on the land described hereon, . . . [and] accurately shows spot elevations and a one (1) foot contour interval as based on those spot elevations . . . .

[DSOF ¶ 37; Doc. 53-30, p. 4]. The signed and certified White survey became a project drawing, which Wallace Engineering and PGAV relied on. [DSOF ¶ 38].

In the summer of 2014, another revised survey was needed because the project boundaries were further expanded. [DSOF ¶ 39]. White issued a revised survey, which PGAV subsequently received. [*Id.*]. The elevations for the Trunk Stop and Pavilion remained the same. [*Id.*].

On June 3, 2014, Bleszynski noticed horizontal discrepancies between the White survey and the master survey of the Zoo, and sent the following email to Shope:

Message

| | |
|---|---|
| **From:** | Mariusz Bleszynski [mariusz.bleszynski@pgav.com] |
| **Sent:** | 6/3/2014 12:00:03 PM |
| **To:** | Scott Shope [/O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=SSHOPE]; Alan Taylor [alantaylor@wallacesc.com] [alantaylor@wallacesc.com] |
| **CC:** | Eileen Hill [eileen.hill@pgav.com]; Ashley Schumake [ashley.schumake@pgav.com]; Lydia Passmore [lydia.passmore@pgav.com]; John Kemper [john.kemper@pgav.com] |
| **Subject:** | FW: 75859 Site survey diagram - areas that need further confirmation |
| **Attachments:** | 75859-00_Tulsa_Zoo_Lost_Kingdom_Tiger_SITE_survey_100scale__20140603.pdf |

Scott,

As we now expanded project boundaries towards the existing pond to the south and Siamang deck to the west, we came across multiple conflicts between new survey prepared for your site and the master survey of the Zoo. Attached is a diagram noting and illustrating the areas of the site survey that might need verification by surveyor. These discrepancies seem to persist since the original surveying at the beginning of the project.

We have also noted areas needing additional existing condition information. This information does not need to be obtained through a detailed survey, but could come from existing files. That includes:
1. Existing Siamang exhibit, noted by green cloud
2. Area between railroad and existing pond, noted by green patch
3. Location and elevation of storm drain the existing pond

The diagram is 11x17 at 1' = 100'-0".

Also: we anticipate that contractor moving soil from excavation by the pond to the exhibit site might need to drive over the railroad. Will Zoo allow closing the train for 2 weeks, ideally in a low season time? The Contractor will be responsible for engineering a temporary crossing.

Thanks,
Mariusz Bleszynski
**PGAV**DESTINATIONS.com
314-231-7318

[DSOF ¶ 40; Doc. 53-29, p. 1].  The attached diagram pointed out four horizontal discrepancies between the White survey and other available TZMI furnished information—some more than five feet long.  [DSOF ¶ 40].  Shope responded less than an hour later:

**From:** Scott Shope [mailto:sshope@tulsazoo.org]
**Sent:** Tuesday, June 03, 2014 12:55 PM
**To:** Mariusz Bleszynski; alantaylor@wallacesc.com
**Cc:** Eileen Hill; Ashley Schumake; Lydia Passmore; John Kemper
**Subject:** RE: 75859 Site survey diagram - areas that need further confirmation

We will obtain measurements in the morning and email to you. From which pond do you need the storm drain location? The drain at the future compensatory location no longer works properly and as such that pond will require a new one.

Thanks,

**SCOTT SHOPE**
*DIRECTOR OF FACILITIES AND GROUNDS*

TULSA ZOO MANAGEMENT, INC.
5701 E. 36TH ST. NORTH
TULSA, OK 74115
(918) 669-6227
WWW.TULSAZOO.ORG

[Doc. 63-24, p. 1].  Bleszynski replied later that afternoon:

| Message | |
|---|---|
| **From:** | Mariusz Bleszynski [mariusz.bleszynski@pgav.com] |
| **Sent:** | 6/3/2014 2:45:15 PM |
| **To:** | Scott Shope [/O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=SSHOPE]; alantaylor@wallacesc.com |
| **CC:** | Eileen Hill [eileen.hill@pgav.com]; Ashley Schumake [ashley.schumake@pgav.com]; Lydia Passmore [lydia.passmore@pgav.com]; John Kemper [john.kemper@pgav.com] |
| **Subject:** | RE: 75859 Site survey diagram - areas that need further confirmation |

Alan,
What Zoo needs it to keep current pond outflow inlet so that they can put back water and restore the pond in the future after compensatory storage is constructed elsewhere on the property. For now we need to add another drain at pool bottom with a valve. The valve to have extended handle to allow operation after the pond is filled.

Scott,
Thanks for clear direction on this.

Thanks,
Mariusz Bleszynski
**PGAV**DESTINATIONS.com
314-231-7318

[Doc. 63-24, p. 1].[11]  Neither Correll nor Shope contacted White.  [DSOF ¶ 41].

Using public funds, the City of Tulsa contracted with Atlas General Contractors to construct the Pavilion and perform the mass excavation and related work.  [DSOF ¶ 42].  TZMI awarded the remaining Lost Kingdom project construction to Nabholz Construction Corp.  [*Id.*].  Project construction started in late 2015.  [Doc. 53-2, p. 1, ¶ 4].  By late February of 2016, Atlas had poured the Pavilion's floor.[12]  [DSOF ¶ 43].  Before constructing above-floor improvements, Atlas was required to certify the Pavilion's finished floor elevation to the City.  [*Id.*].  The surveyor determined the finished floor elevation was 594.61'—1.39' lower than that called for by the project plans, and .39' lower than what the City required.  [*Id.*].  Albert Jones, a registered land surveyor, prepared the certificate reporting the elevation at 594.61'.  [DSOF ¶ 44].  Jones determined that White's certification of the White survey was not an accurate statement due to an elevation error,

---

[11] Although not required to do so, PGAV does not dispute the authenticity of Shope's June 3, 2014, 12:55 p.m. reply or Bleszynski's subsequent email to both Alan Taylor and Shope.  *See* [Doc.70, p. 3].

[12] The cited evidence does not support PGAV's proposition that "[t]he as built floor elevation depended on the accuracy of the White survey."  [DSOF ¶ 43 (citing [Doc. 53-7, pp. 67:11 to 68:4; Doc. 53-11, pp. 42:16-20 and 43:23 to 44:11; Doc. 53-30, p. 1)].

and that White's statement that the elevations were based on NAVD '88 datum was also inaccurate. [*Id.*]. Haynes admitted the survey statement that White used NAVD '88 datum was incorrect, explaining that the wrong survey template had been used. [DSOF ¶ 45].

Wallace Engineering confirmed the inaccuracy of the White survey. [DSOF ¶ 47]. PGAV and Wallace Engineering informed TZMI that the project design required revisions to overcome the survey error. [DSOF ¶ 48]. Raising the floors and other modifications became necessary. [DSOF ¶ 47].

On March 18, 2016, White issued a revised survey that reduced the prior reported elevations by 1.69'. [DSOF ¶ 50]. TZMI thereafter notified White to put its insurance carrier on notice. [DSOF ¶ 51]. TZMI never made a demand to White for a sum certain. [DSOF ¶ 52].

On March 22, 2016, a TZMI Board member on the Building & Grounds Committee, who had met with Shope and Correll, reported to the TZMI Board of Directors the following: (1) White had made an elevation error; (2) all parties were analyzing how to proceed; (3) the Pavilion slab and the Events Center footings would need to be raised; (4) various other project elements may be affected; and (5) the Board would need to decide whether the Trunk Stop, reported to be around 2.5 feet lower than the new improvements, should be remodeled (Option A) or demolished and rebuilt at a higher elevation (Option B). [DSOF ¶ 53]. In April 2016, Correll, Shope, TZMI employee Lindsey Hutchinson, and an Atlas representative prepared "talking points" to present to the TZMI Board regarding why the pre-existing Trunk Stop should be demolished. [DSOF ¶ 55]. The "talking points" were as follows:

See below for reasons to demolish the existing Trunkstop Building:

1.  The original design for the existing Trunkstop building was for the Trunkstop to be located at the same elevation of the surrounding new exhibit building and exterior exhibits. As originally designed, this would allow guests proper site lines into the surrounding exterior exhibits, especially the West Tiger Exhibit, to view the animal exhibits for a unique visitor experience. By leaving the existing Trunkstop Building in place, the original design, master plan vision and guest expectations cannot not be met.

2.  The Lost Kingdom Exhibit Complex is the first of five major "star" exhibits of the Tulsa Zoo's 20 master plan. By leaving the Trunkstop building at its current elevation, the value of the entire exhibit complex is diminished, affecting not only the Lost Kingdom Exhibit Complex, but the entire zoo.

3.  Per FEMA, improvements that can be made to the existing Trunkstop building are capped to 50% of the assessed value. The modifications for flood venting, significant ADA requirements (this is due to the recessed seating area), and recessed dining area would run well over the City of Tulsa mandated cap for improvements to an existing structure located in a flood plain.

4.  The structure and contents are not protected in a 100 year flood. Or we could just delete this—if they ask about this we can just tell them that if it flooded the structure and contents are not protected.

5.  The dining area would need to be recessed, or sunken, compared to surrounding grades, thus limiting the amount of seating for guests in the Trunkstop dining area which will affect earned revenue.

6.  The Komodo dragon exterior exhibit footprint will have to be altered to allow a proper ADA ramp from the surrounding grades to the recessed dining area. Limiting the footprint of this exhibit alters the goals for a world-class facility for both animal management and guests experience opportunities. May be laying this on too think – how much is it cutting out of the space?

7.  Since the existing Trunkstop structure is located in the lowest part of the Zoo, and will have storm drainage connected to a nearby pond, flooding of the Trunkstop building/dining area will be more prone to occurring than the surrounding areas that will be located almost 2' higher.

8.  Significant structural modifications will have to be made to the Trunkstop to allow for the finish grade elevation of the service yard to be achieved. Again, these modifications alter our goals for a world-class facility for both animal management and guest experience as promised to our 622,000 annual guests and our private donors that have donated millions to the first major exhibit of our 20 year Master Plan. Is this where we discuss it affects the animal doors, stairs, and tiger chute as discussed with PGAV? Similar to item 6 that you outlined for Komodo?

[Doc. 53-34].  Correll's changes to item 2 appear in italics in the following:  "*The* Lost Kingdom Exhibit Complex *is the first of five major 'star'* exhibits *of* the Tulsa Zoo's 20 [year] *master plan. By leaving the Trunkstop building at its current elevation, the value* of the *entire exhibit complex is diminished, affecting not only the Lost Kingdom Exhibit Complex, but the entire zoo*."  [DSOF ¶ 55].  A later TZMI document includes the same two initial points.  [DSOF ¶ 55].  Alan Taylor of Wallace Engineering recalled a TZMI representative expressing concerns that the Trunk Stop would look like it was sunk below the rest of the site and that they "[d]idn't want people sitting there eating food and being – looking at people's ankles."  [DSOF ¶ 57; Doc. 53-6, p. 61:8-11].

Additionally, with reference to item six, Hutchinson explained: "Our goal with Lost Kingdom was to build a world-class facility, as I stated. And I felt that limiting the size of the Komodo Dragon exhibit would – would not allow us to deliver our promise to our donors that we were building the best exhibit for our animals" and pointed to her understanding "that a new ADA ramp would greatly reduce the exhibit size, the outdoor exhibit size, for our Komodo Dragons." [Doc. 53-12, p. 10:4-22]. The TZMI Board met in late April 2016 and unanimously voted to demolish the old Trunk Stop and build a new one. [DSOF ¶ 59].

PGAV treated the requisite design change due to the surveying error as additional services and not services required by either signed contract. [DSOF ¶ 54]. By April 13, 2016, TZMI and PGAV had signed Amendment 7 to the July 31, 2013 contract. [DSOF ¶ 58]. Pursuant to the amendment, TZMI agreed to pay PGAV $45,099.00 for additional services:

> The purpose of this amendment is to cover services already expended through March 25th, in analyzing the implications of new survey info, meeting with stakeholders, and formulating a plan to correct the situation. Subsequent amendments will follow covering all further actions necessary.

[DSOF ¶ 58; Doc. 53-32, p. 2].

The meeting minutes of the April 2016 TZMI Board meeting reflect that, on April 12, 2016, the then-TZMI Board President, John Dale, met with White representatives and others. [DSOF ¶ 59]. Dale asked if anyone should share responsibility for TZMI's estimated $1.4 million of damages. [*Id.*]. The minutes thereafter state: "Nabholz representatives with Scott [Shope], Terrie [Correll], John Dale, and Mike Tedford determined that PGAV may hold some responsibility"; "PGAV should have caught the error"; and "[t]iming may be an issue in discussing PGAV responsibility as at this time PGAV is working on redesign plans." [DSOF ¶ 59; Doc. 53-43, p. 2]. That same month, the Board discussed whether to instruct the staff to pay PGAV under protest and reservation of rights, but the Board decided to pay without any qualification. [DSOF

¶ 61]. TZMI decided not to withhold payment because it might force TZMI into having to hire another architect, which would slow the project down. [*Id.*; Doc. 53-16, pp. 28:15 to 29:20].

By June 6, 2016, TZMI and PGAV executed Amendment 8, which covered "[r]evisions required to solve survey discrepancies" and "[n]ew scope related to new dining coordination, outdoor seating layout, shade structures and lighting." [DSOF ¶ 62; Doc. 53-33, p. 1]. Amendment 8 set the additional compensation as $161,870.00. [DSOF ¶ 62]. Neither Amendment 7 (executed in April 2016) nor Amendment 8 contain any reservation of rights by TZMI. [DSOF ¶ 63].

PGAV actually invoiced TZMI $167,121.00 via seven invoices issued for the additional services performed under Amendment 7 and Amendment 8. [DSOF ¶ 64]. PGAV's first invoice for the additional services billed $25,273.00. TZMI paid that amount plus $31,456.19 for basic services. [DSOF ¶ 65]. TZMI paid PGAV $167,721.00 for the additional services stemming from the elevation error after February 2016. [DSOF ¶ 66].

White and TZMI executed a Settlement Agreement effective July 17, 2017. [DSOF ¶ 68]. Pursuant to the Settlement Agreement, White paid TZMI $950,000.00 and TZMI released White "from and with respect to any and all claims, demands, actions, suits, and causes of action (whether direct or derivative in nature) for injuries, losses, damages, or other consequences of every nature . . . that the TZMI Releasors or any of them ever had, now have, or hereafter can, shall, or may have on account of, in any way arising out of, or relating in any way to the Survey or the Project." [DSOF ¶ 68; Doc. 53-36, pp. 1-2].

On November 8, 2017, TZMI filed this lawsuit. TZMI's claimed damages include $50,000 TZMI paid in settlement to Atlas. TZMI did so after the City rejected Atlas's delay damages claim. The settlement resolved disputes that Atlas had with the City and White. [DSOF ¶ 70].

Additionally, in April 2018, TZMI claimed interest due to two loans, including a $2.5 million loan to cover additional project costs. [DSOF ¶ 72]. The $2.5 million loan was "needed to cover the gap due to increased costs of [1] construction (from the original budget) and [2] the elevation error." [DSOF ¶ 73]. Interest paid on the $2.5 million loan totaled $69,521.67 in April 2018. [DSOF ¶ 72]. As of June 2014, i.e., after the two PGAV-TZMI contracts had been signed, TZMI did not contemplate any need for loan financing for the project. [DSOF ¶ 75].

## V. Legal Analysis

As previously stated, PGAV seeks summary judgment as to both TZMI's breach of contract and professional negligence claims. In the alternative, PGAV seeks partial summary judgment as to three of its affirmative defenses related to damages. The court separately considers each issue.

### A. *Breach of Contract*

TZMI claims PGAV breached its contractual duties under § 2.2 to "perform its services consistent with the professional skill and care ordinarily provided by architects"; under § 3.1.2 to "provide prompt written notice to [TZMI] if [PGAV] becomes aware of any error, omission or inconsistency in" information received from TZMI; and under § 3.2.1 to "review laws, codes, and regulations applicable to [PGAV's] services." [Doc. 53-26, pp. 3-5]. TZMI claims PGAV breached these duties in three ways: (1) failing to notify TZMI of the inconsistency between the White survey and 2011 elevation certificates; (2) failing to exercise due care in advising TZMI of the inconsistency between the White survey and the Imel & Graber design drawings; and (3) failing to select NAVD 88 reference datum on its survey requirements form. [Doc. 63, p. 28].

The Agreement includes a choice-of-law provision in favor of Missouri law. *See* [Doc. 53-26, p. 17, § 10.1]. However, citing Oklahoma law, PGAV argues it is entitled to summary judgment on the breach of contract claim because TZMI "alleges no breach of a contractual duty

32

independent of the standard of professional care." [Doc. 53, pp. 22]. In response, TZMI argues that both Oklahoma and Missouri allow "a person injured by the substandard performance of a contractual duty [to] rely on a breach-of-contract theory, a tort theory, or both—provided, of course, that the claimant only achieves a single recovery." [Doc. 63, pp. 27–28].

As an initial matter, the court notes that PGAV's citation to Oklahoma law regarding the breach of contract claim is at odds with statements made by PGAV in other filings with this court. For example, in its response to plaintiff's motion *in limine*, PGAV characterized the Agreement's choice-of-law provision as "establish[ing] the substantive law for TZMI's breach of contract claim, but not for TZMI's professional negligence claim." [Doc. 56, p. 7]; *see also* [Doc. 15, p. 7 (asserting Missouri law governs the interpretation and enforceability of certain Agreement provisions)]. Although TZMI pointed out the seeming inconsistency in PGAV's position in its summary judgment response brief, unfortunately, neither PGAV's reply brief nor supplemental reply brief clarifies its position regarding choice-of-law as to the breach of contract claim. *See* [Doc. 70 and Doc. 80].

Faced with PGAV's seemingly inconsistent positions on the issue, the court shall conduct a choice-of-law analysis. "In making choice of law determinations, a federal court sitting in diversity must apply the choice of law provisions of the forum state in which it is sitting." *Shearson Lehman Bros., Inc. v. M & L Invs.*, 10 F.3d 1510, 1514 (10th Cir. 1993). Oklahoma courts enforce contractual choice-of-law provisions. *Fossil Creek Energy Corp. v. Cook's Oilfield Servs.*, 242 P.3d 537, 541 (Okla. Civ. App. 2010) ("[I]n Oklahoma we abide by 'the maxim that a court will not interfere with the contract of the parties absent fraud, duress, undue influence or mistake . . . .'") (quoting *Bilbrey v. Cingular Wireless, L.L.C.*, 164 P.3d 131, 134 (Okla. 2007)). As previously stated, the Agreement contains a choice-of-law provision for Missouri law.

Although PGAV vigorously objects to application of Missouri law with respect to the professional negligence claim, *see* [Doc. 56, pp. 6-13], it offers no argument as to why Missouri law should not govern TZMI's breach of contract claim. Thus, in accordance with the choice-of-law provision, Missouri law applies to TZMI's breach of contract claim.

Under Missouri law, "[w]hile a mere breach of contract does not necessarily give rise to liability in tort, the acts or omissions which constitute the contractual breach might also breach the duty of reasonable care, thereby yielding tort liability." *Korte Constr. Co. v. Deaconess Manor Ass'n*, 927 S.W.2d 395, 404 (Mo. Ct. App. 1996). The court must consider the origin of the duty. *See Lonergan v. Bank of Am., N.A.*, Case No. 12-CV-04226-NKL, 2013 WL 176024, at *9 (W.D. Mo. Jan. 16, 2013) ("To determine whether an action lies in contract or tort, the Court must first ascertain the origin of the alleged duty."). "[I]f a party sues for breach of duty prescribed by law as an incident of the relation or status which the parties have created by their agreement, the action may be one in tort, even though the breach of duty may also be a violation of the terms of the contract." *Am. Mortg. Inv. Co. v. Hardin-Stockton Corp.*, 671 S.W.2d 283, 293 (Mo. Ct. App. 1984) (quoting *State ex rel. Cummins Mo. Diesel Sales Corp. v. Eversole,* 332 S.W.2d 53, 58 (Mo. Ct. App. 1960)). The Missouri Court of Appeals previously recognized "[a]n architect, as a member of a learned and skilled profession, has a duty to exercise the ordinary and reasonable technical skill that is usually exercised by one in that profession." *Business Men's Assurance Co. of Am. v. Graham*, 891 S.W.2d 438, 453 (Mo. Ct. App. 1994). Thus, a plaintiff may assert both a negligence claim premised on the common law duty to provide architectural services in a professional manner and a breach of contract claim premised on the architect's contractual undertakings. *Id.* Accordingly, TZMI's professional negligence claim does not preclude its contractual claim under Missouri law.

Further, even if the court were to apply Oklahoma law, PGAV would not be entitled to summary judgment as to the whole of TZMI's breach of contract claim. "Oklahoma law has long recognized that an action for breach of contract and an action in tort may arise from the same set of facts." *Flint Ridge Dev. Co., Inc. v. Benham-Blair & Affiliates, Inc.*, 775 P.2d 797, 799 (Okla. 1989); *see also Great Plains Fed. Sav. & Loan Ass'n v. Dabney*, 846 P.2d 1088, 1092 (Okla. 1993) ("We have held a party may bring a claim based in both tort and contract against a professional and that such action may arise from the same set of facts."). "[I]f the alleged contract 'merely incorporates by reference or by implication a general standard of skill or care [to] which a defendant would be bound independent of the contract[,] a tort case is presented . . . .'" *Fed. Dep. Ins. Corp. v. Grant*, 8 F. Supp. 2d 1275, 1295 (N.D. Okla. 1998) (quoting *Dabney*, 846 P.2d at 1092). A claim exists solely under tort "unless there is shown an express agreement by the defendant to do more than use ordinary care in the treatment or representation of plaintiff." *Id.* (quoting *Dabney*, 846 P.2d at 1097 (Summers, J., concurring specially). If evidence exists to support both a breach of contract and a tort claim, the claimant may proceed under both theories, but may only receive a single recovery. *Finnell v. Seismic*, 67 P.3d 339, 344 (Okla. 2003).[13]

---

[13] The court recognizes some tension between *Finnell*—permitting submission to the jury of both a tort and contract claim where the contract contained "an express undertaking to perform in a prudent and careful manner"—and *Dabney.* Further, in *Finnell,* the Oklahoma Supreme Court cited to Justice Opala's concurrence in *Dabney*, in which Justice Opala wrote separately "to correct the misguided notion—which has crept into the stream of extant jurisprudence—that when the same facts give rise to a claim for breach of contract as well as to one in tort for professional malpractice, the plaintiff *must proceed ex delicto unless he/she can prove that the defendant breached (in the course of a contract's performance) an express promise to exercise greater than ordinary care*." *Dabney*, 846 P.2d at 1094-95 (Opala, J., concurring) (emphasis in original). However, because the court concludes that TZMI presents evidence of an agreement to do more than use ordinary care, the court does not deviate from the practice of the Tenth Circuit and federal district courts in Oklahoma to "appl[y] *Dabney* to hold that contracts that merely restate the professional's normal duty of care are sound in tort." *Atkinson, Haskins, Nellis, Brittingham, Gladd & Fiasco, P.C. v. Oceanus Ins. Co.,* No. 13-CV-762-JED-PJC, 2016 WL 5746210, at *2 (N.D. Okla. Sept. 30, 2016).

Oklahoma law requires architects "to exercise ordinary professional skill and diligence in rendering their professional services." *Boren v. Thompson & Assocs.,* 999 P.2d 438, 446 (Okla. 2000). At common law,

> [a]rchitects are only required to exercise ordinary professional skill and diligence and to conform to accepted architectural standards; their contracts do not guarantee perfect plans or satisfactory results. Architects are only liable for failure to exercise reasonable care and professional skill in the preparation and execution of their plans according to their contract.

*Smith v. Goff*, 325 P.2d 1061, 1064 (Okla. 1958). Here, TZMI alleges PGAV breached its contractual obligation pursuant to § 3.1.2 to "provide prompt written notice to [TZMI] if [PGAV] becomes aware of any error, omission or inconsistency in" information received from TZMI. [Doc. 53-26, p. 4]. Section 3.1.2 requires specific notice to TZMI upon the finding of an inconsistency during PGAV's review of information provided by TZMI, rather than merely imposing an obligation of ordinary care. *See Sch. Bd. of Broward Cnty. v. Pierce Goodwin Alexander & Linville*, 137 So. 3d 1059, 1065-66 (Fla. Dist. Ct. App. 2014) (express provision may provide for heightened standard of care); *see also Wills v. Black & West, Architects*, 344 P.2d 581, 584 (Okla. 1959) (where party does not guarantee performance, ordinary care applies). Thus, the parties have specified certain performance obligations beyond the general standard of care and therefore TZMI's breach of contract claim is viable under Oklahoma law to the extent premised on PGAV's alleged breach of § 3.1.2.

PGAV does not seek summary judgment on TZMI's breach of contract claim on any other basis. Accordingly, the court next considers TZMI's professional negligence claim.

B.      *Professional Negligence*

TZMI asserts a professional negligence claim premised on the same conduct underlying its breach of contract claim.[14]   Under both Missouri and Oklahoma law, a professional negligence claim requires proof of three elements:  (1) the existence of a duty to protect plaintiff from the claimed injury; (2) failure to perform that duty; and (3) that defendant's breach proximately caused plaintiff's claimed injury.  *Peeler v. DeWitt*, 3 S.W.3d 894, 895 (Mo. Ct. App. 1999) ("To establish that [defendant] was negligent, [plaintiff] had the burden of establishing that [defendant] had a duty to the [plaintiff], that he failed to perform his duty and that this failure was the proximate cause of the [plaintiff's] injuries."); *Smith v. Hines*, 261 P.3d 1129, 1133 (Okla. 2011).  PGAV argues it is entitled to summary judgment for two separate reasons: (1) PGAV breached no duty owed to TZMI and (2) PGAV did not proximately cause TZMI's claimed damages.  The court separately considers each argument.

1.      Existence and Breach of a Duty

Pursuant to both Missouri and Oklahoma law, the existence of a duty is a threshold issue that must be determined by the court as a matter of law.  *Hoffman v. Union Elec. Co.*, 176 S.W.3d 706, 708 (Mo. 2005) ("Of course, in order for a plaintiff to make a submissible case of negligence, a plaintiff must establish that there was a duty . . . .  Whether a duty exists is purely a question of law.") (internal citations and quotations omitted); *Smith v. City of Stillwater*, 328 P.3d 1192, 1200 (Okla. 2014) ("The cornerstone of a negligence action is the existence of a duty, and the issue of

---

[14] Because the result with respect to TZMI's professional negligence claim is the same under Missouri or Oklahoma law, the court does not conduct a choice-of-law analysis for purposes of summary judgment.  *Zenergy, Inc. v. Coleman*, Case No. 09-CV-0381-CVE-FHM, 2009 WL 3571314, at *3 (N.D. Okla. Oct. 26, 2009) ("The Court need not resolve the choice of law issue at this time, because the result under either is the same.").

whether a duty exists is a question of law.").  The court looks to the agreement of the parties to determine the scope of the duty undertaken.  *See Peeler*, 3 S.W.3d at 896; *Waggoner,* 657 P.2d 147, 149 (Okla. 1982).  Architects are required to "exercise ordinary professional skill and diligence" in rendering those professional services.  *Boren,* 999 P.2d at 446; *Graham*, 891 S.W.2d at 453 ("An architect, as a member of a learned and skilled profession, has a duty to exercise the ordinary and reasonable technical skill that is usually exercised by one in that profession.").

As previously stated, TZMI asserts PGAV breached its professional duty by (1) not notifying TZMI of the inconsistency between the White survey and the 2011 elevation certificates, (2) not exercising due care in advising TZMI of the inconsistency between the White survey and the Imel & Graber design drawings, and (3) not selecting NAVD 88 reference datum on its survey requirements form.  [Doc. 63, pp. 28 and 34].  The court considers each alleged breach in turn.

*First*, with respect to PGAV's failure to notify TZMI of the inconsistencies between the White survey and the 2011 elevation certificates, PGAV argues it did not breach its duty because it provided written notice as required by the Agreement when it became "aware" of the inconsistencies.[15]  [Doc. 53, pp. 27-28].  PGAV points to the undisputed facts that PGAV received the White survey on September 7, 2012 and sent to e-mails to TZMI on November 8, 2012, noting the discrepancy between the finished floor elevation on the White Survey and *Imel & Graber drawings*.[16]  [DSOF ¶¶ 21, 25, and 28].  However, TZMI claims PGAV breached its duty by failing

---

[15] As previously stated, § 3.1.2 of the Agreement states: "The Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any error, omission or inconsistency in such services or information."  [Doc. 53-26, p. 4].

[16] PGAV also asserts it informed TZMI of the discrepancy between the White survey and Imel & Graber drawings during a subsequent conference call.  However, a genuine dispute of material fact exists as to whether a subsequent conference call occurred and, if so, whether the finished floor elevation discrepancy was discussed.  *Cf.* [Doc. 53-18, pp. 35:18 to 39:17 and 65:2-1; Doc. 53-8,

to provide TZMI notice of an inconsistency between the White survey and elevation certificates prepared by a surveyor hired by the City of Tulsa in May 2011—not the Imel & Graber drawings. PGAV refers to the June 3, 2014 e-mail from Bleszynski noting that "discrepancies seem to persist since the original surveying at the beginning of the project." [DSOF ¶ 40; Doc. 53-29, p. 1]. However, PGAV presents no evidence Bleszynski was referring to the 2011 elevation certificates with respect to the "persist[ing]" discrepancies.

TZMI presents evidence that, in May 2011, the City of Tulsa hired a surveyor to determine and certify the elevation of certain structures at the Tulsa Zoo, including the Trunk Stop and BOK Pavilion. [Doc. 63-7, p. 9:23 to 10:9]. The 2011 elevation certificates show a finished floor elevation for the Trunk Stop of 592.33 feet and the BOK Pavilion of 592.1 feet. [Doc. 63-8, p. 3; 63-9, p. 4]. TZMI submits evidence that PGAV received the 2011 elevation certificates prior to June 14, 2012. [Doc. 63-10, pp. 58:16 to 60:24; Doc. 63-8, pp. 1 and 3; Doc. 63-9, pp. 1 and 4]. Further, Bleszynski testified that he referred to the 2011 elevation certificates in drafting and sending a June 21, 2012 e-mail to the City of Tulsa which noted that both the Trunk Stop and BOK Pavilion were below the base flood elevation. [Doc. 63-9; Doc. 63-6, pp. 54:9-14, 56:12 to 57:14, and 62:14 to 64:6]. Contrary to PGAV's assertions [Doc. 70, p. 6], a reasonable juror could infer from Bleszynski's June 21, 2012 e-mail (and the subsequent receipt of the White survey) that he, and therefore, PGAV was aware of a discrepancy between the 2011 elevation surveys and the White survey. *See Wandersee v. BP Prods. N. Am., Inc*., 263 S.W.3d 623, 629 (Mo. 2008) (a corporation "can obtain knowledge only through its agents and, under the well-established rules of agency, the knowledge of agents obtained in the course of their employment is imputed to the

___

pp. 46:16 to 50:1] *with* [Doc. 63-10, pp. 26:17-19 and 43:23-24; Doc. 63-7, p. 63:2-14; and Doc. 63-4, p. 63:4-18].

corporation"); *State ex rel. G.E. Hettel v. Sec. Nat'l Bank & Trust Co. in Duncan*, 922 P.2d 600, 607 n.18 (Okla. 1996) ("A corporation is generally charged with knowledge which its officer or agent receives or acquires while acting in the course of employment regardless of whether the officer or agent in fact communicates such knowledge to the corporation.").[17]

Based on these facts, a reasonable juror could infer that PGAV was aware of a discrepancy between the 2011 elevation certificates and the White survey but failed to notify TZMI of the inconsistencies pursuant to § 3.2.1 of the Agreement. Accordingly, PGAV is not entitled to summary judgment on TZMI's professional negligence claim to the extent premised on PGAV's failure to notify TZMI of the discrepancy between the 2011 elevation certificates and the White survey.

*Second,* with regard to TZMI's claim that PGAV breached its duty to advise TZMI of the significance of the elevation discrepancy between the White survey and the Imel & Graber drawings, PGAV argues that it was under no duty to explain the import of the inconsistency and, further, it was entitled to rely on the White survey. With regard to PGAV's obligation to advise TZMI of the significance of the elevation discrepancy, PGAV contends its duty under § 3.2.1 is limited to providing notice and "that expressly-defined scope does not expand to furnishing an explanation of the import of such an inconsistency." [Doc. 70, p. 6]. PGAV is correct that the Agreement requires only that PGAV shall "provide prompt written notice to [TZMI] if [PGAV] becomes aware of any error, omission or inconsistency" in information provided by TZMI. [Doc. 53-26, p. 4, § 3.1.2]. Further, it is undisputed that, on November 8, 2012, Schumake, with Bleszynski's assistance, e-mailed Shope to notify him that "[t]he site survey is showing that the

---

[17] To the extent PGAV argues Bleszynski forgot about the 2011 elevation certificates, "[t]here is no such thing as corporate amnesia." *Samaron Corp. v. United of Omaha Life Ins. Co.,* 822 F.3d 361, 363 (7th Cir. 2016).

Trunk Stop elevation is +595.5, while the existing drawings show +592.5." [DSOF ¶ 25]. It is undisputed that Shope understood Schumake was comparing the elevation on the White survey with the elevation on the Imel & Graber drawings. [DSOF ¶ 26]. That same day, Schumake again e-mailed Shope, and copied Correll, again setting out the discrepancies. [DSOF ¶ 28].

However, both the Agreement and Oklahoma/Missouri law required PGAV to exercise "ordinary professional skill and diligence" in providing such notice. *See* [Doc. 53-26, p. 3, § 2.2 ("The Architect shall perform its services consistent with the professional skill and care ordinarily provided by architects practicing in the same or similar locality under the same or similar circumstances.")]; *Boren,* 999 P.2d at 446; *Graham,* 891 S.W.2d at 453. It is undisputed that Correll knew zoo improvements frequently did not match construction designs and therefore the inconsistency did not suggest a survey error to her. [DSOF ¶ 33]. Thus, although it is undisputed that PGAV notified TZMI of the discrepancy, evidence exists from which a jury may infer that TZMI failed to understand the import of the information. Further, TZMI submits evidence that an ordinary architect practicing in Tulsa and exercising professional skill and diligence would have explained the significance of the discrepancy between the White survey and Imel & Graber drawings. *See* [Doc. 63-18, pp. 38:5-23 and 122:6-12; Doc. 63-19, pp. 5-6].[18] Based on this evidence, a reasonable juror could infer that PGAV breached its duty to TZMI and therefore summary judgment is inappropriate on this basis. *See Hackmann v. Mo. Am. Water Co.,* 308 S.W.3d 237, 239 (Mo. Ct. App. 2009) ("Summary judgment is frequently inappropriate in a negligence case particularly where the issue is whether there are facts upon which the trier of fact

---

[18] For purposes of this motion, the court does not rely on those portions of the deposition of TZMI's expert Cara Shimkus Hall that are the subject of PGAV's Combined Motion *in Limine* No. 2. [Doc. 48]. Further, to the extent that PGAV would point to the alleged November 9, 2012 telephone call explaining the discrepancy, as previously stated, a dispute of fact exists as to whether the telephone call occurred.

could find a breach of an admitted or otherwise established duty."); *id.* ("Where there is a general duty to exercise some type of care the next question is whether the defendant should or should not have acted in a particular way or refrained from acting. This analysis is evaluated based on the facts of the case and this determination is an issue for the jury.") (internal citation omitted); *Leak-Gilbert v. Fahle*, 55 P.3d 1054, 1057 (Okla. 2002) ("If a duty exists, the trier of fact then determines whether a violation of that duty has occurred.").

PGAV also argues, however, that it was entitled to rely on the White survey under § 3.1.2 of the Agreement. However, interpreting the Agreement as a whole, nothing therein suggests that PGAV's "right to rely" nullifies its obligation to provide "prompt written notice" of any "error, omission or inconsistency." Rather, the Agreement provides for PGAV's duty to notify in the section defining PGAV's services and requires PGAV to "perform its services consistent with . . . professional skill and care." [Doc. 53-26, pp. 3-4]. *See* 15 Okla. Stat. § 157 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others."); *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 44 (Mo. 2017) ("The intention of the parties is to be gleaned from the four corners of the contract. Each clause must be read in the context of the entire contract, and interpretations that render provisions meaningless should be avoided.") (internal citations and quotations omitted).

Further, the cases cited by PGAV in support of its right to rely are distinguishable as, in those cases, plaintiffs' claims were premised on the failure to conduct an independent investigation. In *Taylor v. DeLosso*, the plaintiff premised his negligence claim on the architect's failure to conduct an independent site inspection but pointed to no contractual provision expressly requiring such an inspection. *Taylor v. DeLosso*, 725 A.2d 51, 54-56 (N.J. Super. Ct. 1999) (noting expert made no reference to "any written document, or even unwritten custom or practice

indicating that the consensus of the architectural community recognizes a duty to make a site inspection for 'small sites'").  Thus, the court concluded that the "reliance" provision included in the contract "nullifies [the] unsupported conclusion that defendant had a duty to make a site inspection to check the accuracy of the physical features contained in the . . . survey."  *Id.* at 56; *see also Jacka v. Ouachita Parish Sch. Bd.,* 186 So. 2d 571, 575 (La. 1966) (gross negligence claim premised on reliance on five-year old survey that included such a large area it did not correctly exhibit contours and elevations for construction purposes); *Bell v. Jones,* 523 A.2d 982, 996 (D.C. Ct. App. 1986) (claim that architect was contributorily negligent in relying on plat survey because it did not include contours, utilities, or angles and where surveyor was not informed of specific purpose of survey).  Unlike *Taylor* and other cases relied on by PGAV, TZMI objects to PGAV's alleged failure to notify it of potential inconsistencies as required by § 2.2 of the Agreement, not merely PGAV's failure to conduct an independent investigation.  Thus, the "right to rely" provision does not vitiate PGAV's duty with respect to notice and a question of fact exists as to whether PGAV breached its duty.

*Third*, with respect to PGAV's alleged tortious breach of duty by failing to select NAVD 88 reference datum on its survey requirements form, PGAV argues the Agreement did not require PGAV to identify its survey needs and therefore it owed no duty to specify that the survey should utilize the NAVD 88 reference datum.  In response, TZMI points to PGAV's contractual obligation to "review laws, codes, and regulations applicable to [its] services," [Doc. 53-26, p. 5, § 3.2.1], and argues that had PGAV reviewed the Tulsa City Code of Ordinances, it would have known to use the NAVD 88 datum.  As previously stated, the court begins its analysis at the Agreement.

It is undisputed that the Agreement's Article 5, titled "Owner's Responsibilities," requires TZMI to "furnish surveys to describe physical characteristics, legal limitations and utility locations

43

for the site of the Project, and a written legal description of the site," which shall include "locations, dimensions and necessary data with respect to existing buildings . . . ." [Doc. 53-26, p. 12, § 5.4; Doc. 14-1, p. 16, § 5.6]. In that same subsection, the Agreement expressly requires that "[a]ll the information on the survey shall be referenced to a Project benchmark." [*Id.*]. Under Missouri law,

> [t]he terms of a contract are read as a whole to come to the intention of the parties. In that exercise each term is construed to avoid an effect which renders other terms meaningless: a construction which attributes a reasonable meaning to all the provisions of the agreement is preferred to one which leaves some of them without function or sense.

*Vill. of Cairo v. Bodine Contracting Co.*, 685 S.W.2d 253, 264 (Mo. Ct. App. 1985). Reading the Agreement as a whole, the court cannot reasonably interpret the document to require PGAV to specify the necessary survey datum. The Agreement obligates TZMI, not PGAV, to furnish surveys. [Doc. 53-26, p. 12, § 5.4; Doc. 14-1, p. 16, § 5.6]. That same section requires the survey to include locations, dimensions, and necessary data with respect to existing buildings and requires that the survey reference a Project benchmark. [*Id.*]. To interpret the Agreement to impose the obligation to ensure the appropriate reference is used on PGAV, rather than TZMI, would render TZMI's obligations with respect to furnishing surveys superfluous.

Further, although TZMI argues that Tulsa City Code of Ordinances require the use of the NAVD 88 datum, TZMI points to no legal authority for that proposition. Nor has the court identified any law, code, or regulation requiring use of the NAVD 88 datum. Although TZMI argues that, because the FEMA flood insurance rate map utilizes NAVD 88 datum and the City ordinances require new construction to be above regulatory flood elevation, NAVD 88 datum is required, regulations promulgated by FEMA to implement the National Flood Insurance Program do not define "flood elevation" with respect to the NAVD 88 datum. *See* 44 C.F.R. § 59.1. Rather, the regulations provide that base flood elevations shown on a community's FEMA flood insurance

rate map may be referenced to the NGVD of 1929 or "other datum." *Id.* (defining "mean sea level" and "water surface elevation"). Further, TZMI's argument would require the court to construe the FEMA flood insurance rate map as a "law[], code[], [or] regulation." *See* [Doc. 53-26, p. 5, § 3.2.1 (requiring PGAV to "review laws, codes, and regulations applicable to the Architect's services"). Such an interpretation is contrary to the plain meaning of the Agreement's terms and is therefore impermissible. *TAP Pharm. Prods., Inc. v. State Bd. of Pharmacy*, 238 S.W.3d 140, 143 (Mo. 2007).

The court cannot reasonably construe the Agreement to impose a duty on PGAV to require the use of the NAVD 88 reference datum. Therefore, no duty arose for PGAV to select NAVD 88 reference datum on the survey requirements form and PGAV's failure to do so cannot constitute actionable negligence. Summary judgment is granted as to TZMI's professional negligence claim to the extent the claim is premised on PGAV's failure to specify use of the NAVD 88 reference datum on the survey requirements form.[19]

2. <u>Proximate Cause</u>

PGAV next argues it is entitled to summary judgment because PGAV did not proximately cause TZMI's damages.

PGAV first contends that TZMI lacks proper proof of proximate causation because it presents no expert testimony on proximate causation of damages. PGAV cites Oklahoma case law for the proposition that "[e]xpert testimony is ordinarily necessary to establish causation in professional negligence cases." [Doc. 53, p. 32 (quoting *Ellison v. Campbell,* 326 P.3d 68, 73 (Okla. 2014)]. PGAV's statement of law is accurate but incomplete. *In Ellison*, the Oklahoma

---

[19] For the same reasons, PGAV is entitled to summary judgment as to TZMI's breach of contract claim to the extent premised on the omission of NAVD 88 reference datum on the survey requirements form.

Supreme Court went on to state "an expert is not required if the element of damage lies within the common knowledge of lay persons." *Ellison*, 326 P.3d at 73. Thus, expert testimony is not necessary "to establish the cause of an objective injury where there is competent evidence, without such testimony, to establish the cause with reasonable certainty." *Boxberger v. Martin*, 552 P.2d 370, 373 (Okla. 1976). Missouri law is in accord. *See Ploch v. Hamai,* 213 S.W.3d 135, 141 (Mo. Ct. App. 2006) (holding in professional negligence case "[c]ausation may be shown through expert testimony, circumstantial evidence or favorable inferences drawn from all the evidence"); *Henderson v. Smith*, 643 S.W.2d 882, 885 (Mo. Ct. App. 1982).

The court concludes the asserted injury in this case is within the common knowledge of lay persons and expert testimony regarding causation is not necessary. The facts presented on summary judgment appear to be straightforward. PGAV, at various points, understood that the Trunk Stop was below the required base flood elevation. The White survey indicated that the Trunk Stop was not below the required base flood elevation. A genuine dispute of fact exists as to whether PGAV provided adequate notice and explanation of the discrepancy to TZMI. TZMI has presented evidence that the Lost Kingdom could have been designed to account for the Trunk Stop being below the required base flood elevation. Construction of the Lost Kingdom proceeded based on the White survey, which later required design changes and the incursion of additional costs. A juror with common knowledge could understand and assess whether PGAV caused TZMI's injuries.

PGAV argues specialized knowledge is required because TZMI's claimed damages are overstated. PGAV specifically points to TZMI's claimed damages which it contends constitute "added value" or are not recoverable as a matter of law because the damages were inevitable to overcome the physical condition of the property. PGAV's argument is more appropriately

construed to relate to the measure of damages, not proximate cause. Under both Missouri and Oklahoma law, the appropriate measure of damages is a question of law for the court to decide—not the jury. *See John A. Brown Co. v. Clause*, 235 P.2d 680, 685 (Okla. 1951) ("What elements of damages are proper and measure of damages are questions of law, but generally the amount of damages is a question for the jury."); *Scheck Indus. Corp. v. Tarlton Corp.,* 435 S.W.3d 705 (Mo. Ct. App. 2014) ("The proper measure of damages is a question of law for determination by the trial court.") (quotations and citations omitted). Thus, under these facts, expert testimony as to causation is not necessary.

Apart from expert testimony, PGAV argues that TZMI otherwise fails to present sufficient evidence that PGAV's alleged breaches proximately caused TZMI's injury. PGAV contends that it informed TZMI of the discrepancies in November 2012 and that TZMI was remiss in failing to contact White or conduct additional investigation. [Doc. 53, pp. 35-36]. Causation is ordinarily a question of fact for the jury. *See Lefthand v. City of Okmulgee*, 968 P.2d 1224, 1226 (Okla. 1998); *Williams v. Daus*, 114 S.W.3d 351, 359 (Mo. Ct. App. 2003). Causation may be decided as a matter of law only "when the facts are undisputed and there is *no evidence* from which a jury could reasonably find a causal connection between the allegedly negligent act and the injury." *Lefthand*, 968 P.2d at 1226; *Williams*, 114 S.W.3d at 359 ("Absent compelling evidence which establishes the absence of causation, the causation question is for the jury.").

As previously stated, a genuine issue of material fact exists as to whether PGAV breached its duties to notify TZMI of the discrepancy between the 2011 elevation certificates and the White survey, as well as to explain the discrepancy between the White survey and the Imel & Graber construction drawings. Additionally, TZMI submits evidence of the following: In 2012, it instructed PGAV to proceed with planning the Lost Kingdom so as to preserve the Trunk Stop and

conserve money. [Doc. 63-15, at p. 1; Doc. 63-6, p. 92:6-19]. Elevation certificates prepared in 2011 utilizing the NAVD 88 datum show a finished floor elevation for the Trunk Stop of 592.33'. [Doc. 63-9, p. 4]. In planning the Lost Kingdom, PGAV relied on the White survey, [Doc. 53-3, at 1, ¶ 4], which utilized a local control point and showed the Trunk Stop as having a finished floor elevation of approximately 595'. [Doc. 63-6, p. 107:11-18; Doc. 63-3, pp. 41:15-22 and 135:5-14]. The elevation discrepancy was not discovered until 2016, at which point contractors had already poured the foundation for the Lost Kingdom's indoor animal exhibit and Special Events Pavilion. [Doc. 63-25, pp. 16:22 to 19:12]. The indoor exhibit had a finished floor elevation approximately two-and-a-half or three (3) feet higher than that of the Trunk Stop. [Doc. 63-5, pp. 129:4-10]. The discrepancy was visually apparent and obstructed the view of patrons to the tiger enclosure and aviary. [Doc. 63-5, pp. 129:4 to 132:23; Doc. 63-6, pp. 139:22 to 140:8]. Additionally, necessary changes to ensure ADA compliance would require reducing the size of the outdoor Komodo Dragon exhibit and Trunk Stop seating area. [Doc. 63-5 at pp. 130:2 to 131:3; Doc. 63-28, pp. 10:20 to 11:16]. For these reasons, among others, TZMI determined its only viable option was to demolish the Trunk Stop and rebuild it at an elevation matching the rest of the Lost Kingdom. [Doc. 63-5, pp. 130:2 to 131:13]. Based on this evidence, a reasonable jury could find that PGAV's failure to adequately notify TZMI of the discrepancy between the 2011 elevation certificates and the White survey, as well as to explain the discrepancies between the White survey and the construction drawings, caused the construction of the Lost Kingdom based on the erroneous White survey, which necessitated the demolition and reconstruction of the Trunk Stop— *i.e.,* TZMI's injury. Thus, a genuine dispute of material fact exists as to causation.

Finally, PGAV argues it is entitled to summary judgment because a supervening cause exists—Shope and/or Correll's failure to conduct an additional investigation following a June 2014

e-mail from Bleszynski regarding surveying discrepancies.  *See* [Doc. 53, pp. 36-37].   Under both Oklahoma and Missouri law,

> [t]o qualify as a true supervening cause that cuts off possible liability for the original negligence, a cause must meet at least three requirements: (1) it must be independent of the original act (2) it must be adequate of itself to bring about the result and (3) it must not have been a reasonably foreseeable event.

*Minor v. Zidell Tr.*, 618 P.2d 392, 394 (Okla. 1980); *see also Buchholz v. Mosby-Year Book, Inc.*, 969 S.W.2d 860, 862 (Mo. Ct. App. 1998) (internal citation omitted) ("The intervening act must be a superseding cause that is independent of the original actor's negligence and severs the connection between the original actor's conduct and the plaintiff's injury as a matter of law.  For an intervening act to relieve the original tortfeasor from liability, the act cannot be a foreseeable consequence of the original act of negligence.").  Generally, the issue of whether the consequences of the original act of negligence could have been reasonably foreseen is a question for the trier of fact.  *See State ex rel. Okla. Dep't of Pub. Safety v. Gurich*, 238 P.3d 1, 5 (Okla. 2010); *Buchholz*, 969 S.W.2d at 862 ("Questions of proximate cause and efficient, intervening cause require each case to be decided on its own facts.").

It is undisputed that, on June 3, 2014, Bleszynski noticed horizontal discrepancies between the White survey and the master survey of the Zoo, and e-mailed Shope regarding "multiple conflicts between new survey prepared for your site and the master survey of the Zoo" and "discrepancies [that] seem to persist since the original surveying at the beginning of the project."  [DSOF at ¶ 40; Doc. 53-29, p. 1].  PGAV argues TZMI's failure to direct White to investigate "could not be objectively anticipated and therefore is not foreseeable."  [Doc. 53, p. 36].  However, it is undisputed that the diagram attached by Bleszynski pointed out only four horizontal discrepancies—not vertical discrepancies.  [DSOF at ¶ 40; Doc. 53-29, p. 2].  Further, TZMI presents evidence that Shope interpreted the e-mail as requesting field measurements, which he

indicated he would obtain in the morning and e-mail to Bleszynski. [Doc. 63-24, p. 1]. Bleszynski responded with "[t]hanks for clear direction on this." [*Id.*]. The record includes no evidence indicating that Bleszynski specifically raised the vertical discrepancies with Shope in June 2014. Based on the evidence submitted, a reasonable trier of fact could conclude that TZMI's failure to investigate following Bleszynski's June 3, 2014 e-mail was a foreseeable consequence of PGAV's failure to notify TZMI of the discrepancy between the 2011 elevation certificates and the White survey and, further, failure to provide adequate explanation of the potential import of discrepancies between the construction drawings and White survey. Accordingly, the court cannot conclude that TZMI's 2014 failure to request that White conduct an additional investigation constitutes a supervening cause as a matter of law, and summary judgment is not appropriate.

C.     *Partial Summary Judgment as to Damages*

PGAV also seeks partial summary judgment on three of its affirmative defenses regarding damages related to the White settlement, voluntary payments, and the waiver of consequential damages.

> Where, as here, a defendant moves for summary judgment [on] an affirmative defense, "[t]he defendant ... must demonstrate that no disputed material fact exists regarding the affirmative defense asserted." *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997). Once the defendant makes this initial showing, "the plaintiff must then demonstrate with specificity the existence of a disputed material fact." *Id.* If the plaintiff cannot meet this burden, "the affirmative defense bars [its] claim, and the defendant is then entitled to summary judgment as a matter of law." *Id.*

*Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011).

1.     White Settlement

PGAV first argues that, under the "one satisfaction rule," it is entitled to partial summary judgment in the amount of a $950,000 as a credit for TZMI's settlement with White. In doing so, PGAV primarily relies on Oklahoma law, including 12 Okla. Stat. § 832(H)(1). [*Id.*]. However, based on motion *in limine* briefing submitted by the parties, it is clear that determination of the

effect of the White settlement will require analysis of comparative negligence principles and damage apportionment under the applicable state law. The parties did not brief choice-of-law in the summary judgment briefing. Nor has the issue been squarely presented to this court.[20] Thus, the court cannot determine this issue on summary judgment. The parties shall brief choice-of-law for the professional negligence claim and damages in their respective trial briefs, which are due on June 10, 2019. *See* [Doc. 83].

### 2. Voluntary Payments to PGAV

PGAV next claims it is entitled to partial summary judgment in the amount of $167,721.00 as a credit under the voluntary payment doctrine. [Doc. 53, pp. 39-41]. The voluntary payment doctrine bars recovery of voluntary payments made with full knowledge of all the facts and absent fraud or duress. *Stephenson Oil Co. v. Citgo Petroleum Corp.*, No. 08-CV-380-TCK-TLW, 2010 WL 2998604, at *13 (N.D. Okla. July 28, 2010) (citing *Hadley v. Farmers' Nat'l Bank of Okla. City*, 257 P. 1101, 1103-04 (Okla. 1927)); *Pitman v. City of Columbia*, 309 S.W.3d 395, 403-04 (Mo. Ct. App. 2010).

PGAV contends that payments by TZMI to PGAV totaling $167,121.00 constitute non-recoverable voluntary payments "made after TZMI was well aware of the White error and the fact that PGAV, in TZMI's view, should share responsibility." [Doc. 53, p. 39]. In response, TZMI argues TZMI chose to pay PGAV under duress, describing its payments as occurring "in a moment of urgent necessity" to prevent further delays in construction of the Lost Kingdom and so as not to jeopardize future fundraising efforts. [Doc. 63, p. 39].

---

[20] With respect to its motion *in limine* seeking exclusion of evidence of the White settlement, TZMI specifically stated that it was not asking the court to resolve choice-of-law. [Doc. 45, p. 3]. In response, PGAV includes over six pages directed to choice-of-law and argues that Oklahoma law applies. [Doc. 56, pp. 6-13]. In its reply, TZMI again requests that the court not decide the choice-of-law issue at this point and asks the court to direct briefing on the issue. [Doc. 65, p. 6].

As previously stated, generally both Oklahoma and Missouri law prohibit recovery of payments made with full knowledge of all the facts absent duress.[21] *Hadley,* 257 P.2d at 1103-04; *Pitman,* 309 S.W.3d at 403-04. Both Oklahoma and Missouri courts recognize "economic duress" or "business necessity." *Brown v. Worthington*, 142 S.W. 1082, 1084-85 (Mo. Ct. App. 1912); *Cimarron Pipeline Constr., Inc. v. U.S. Fid. & Guar. Ins. Co.*, 848 P.2d 1161, 1165 (Okla. 1993); *see also Doctrine of "Business Compulsion*," 79 A.L.R. 655 (originally published in 1932) ("I[t] seems to be established as a general rule, at least in this country, that the payment of money or the making of a contract may be under such circumstances of business necessity or compulsion as will render the same involuntary and entitle the party so coerced to recover the money paid . . . .").

It is undisputed that, as early as April 12, 2016, TZMI suspected that PGAV "may hold some responsibility" with respect to the Lost Kingdom project. [DSOF ¶ 59]. That same month, the TZMI Board elected to pay PGAV's invoices without qualification. [DSOF ¶ 61]. However, it is also undisputed that TZMI decided not to withhold payment because it might require TZMI to hire another architect, which would result in further delays to the Lost Kingdom. [*Id.*; Doc. 53-16, pp. 28:15 to 29:20]. TZMI submits evidence construction was largely idle while the parties assessed how to proceed in light of the elevation discrepancies. [Doc. 63-25, pp. 19:4-7 and 22:18-21]. Moreover, TZMI presents evidence that TZMI employees and board members felt TZMI did not have the option to go to another design professional and still satisfy existing donor obligations and timeframe. [Doc. 63, p. 24, ¶ 76; Doc. 63-5, p. 140:4-22; Doc. 63-26, pp. 28:22 to 29:5].[22]

---

[21] Because TZMI does not contend fraud exists and presents no evidence of fraud, the court does not consider fraud in relation to the voluntary payments doctrine. *See* [Doc. 63, pp. 38-39].

[22] In its reply brief, PGAV contends that "[w]hat scanty evidence TZMI presents in TZMI SOF 76 does not rise to the level of duress." [Doc. 70, p. 13]. However, it is not the province of the court to weigh evidence when deciding a motion for summary judgment. *Anderson*, 477 U.S. at 249.

Based on these facts and evidence, a reasonable juror could conclude that, despite its knowledge of PGAV's potential liability, TZMI paid PGAV $167,721.00 for services rendered out of business necessity/economic duress. Therefore, a genuine dispute of material facts exists with respect to application of the voluntary payment doctrine.

### 3. Atlas Settlement and Financing Costs

Last, PGAV argues that, under the consequential damages waiver in § 8.1.3 of the Agreement, TZMI is not entitled to recover the $50,000.00 Atlas payment or the $69,521.67 TZMI incurred in additional financing costs.

As previously stated, Missouri law applies to interpretation of the Agreement. Missouri law permits parties to a contract to contractually limit future remedies, including consequential damages. *See Purcell Tire & Rubber Co., Inc. v. Exec. Beechcraft, Inc.*, 59 S.W.3d 505, 508 (Mo. 2001); *Gen. Elec. Cap. Corp. v. Rauch*, 970 S.W.2d 348, 358 (Mo. Ct. App. 1998). TZMI does not contest the applicability of the waiver provision with respect to its breach of contract claim but argues that provision does not preclude recovery for consequential damages in *tort*. [Doc. 63, p. 40]. The court is not persuaded.

Section 8.1.3 applies to "claims, disputes or other matters in question arising out of or relating to this Agreement . . . ." [Doc. 53-26, p. 14, § 8.1.3]. In support of its position, TZMI relies on the principle of *expressio unius* and points to the Agreement's reference to tort claims in § 8.1.1, and lack of reference to tort claims in § 8.1.3. "*Expressio unius*" means "'the expression of one thing is the exclusion of another' or 'the mention of one thing implies exclusion of another.'" *Gen. Am. Life Ins. Co. v. Barrett*, 847 S.W.2d 125, 133 (Mo. Ct. App. 1993) (quoting Black's Law Dictionary 521 (5th ed. 1979)). The court concludes the maxim is inapplicable. Section 8.1.3, the consequential damages waiver, mentions neither contract claims nor tort claims

specifically. [Doc. 53-26, pp. 14-15, § 8.1.3]. Rather, the waiver applies to "claims, disputes, or other matters."

TZMI's reference to § 8.1.1 in fact implicates the principle of contract construction that requires that "[c]ontract language is not interpreted in a vacuum, but by reference to the contract as a whole." *Purcell Tire & Rubber Co.*, 59 S.W.3d at 510. Section 8.1.1 requires that "all claims and causes of action, whether in contract, tort, otherwise, against the other arising out of or related to this Agreement" be submitted to the method of binding dispute resolution provided in the Agreement. [Doc. 53-26, p. 14, § 8.1.1]. Section 8.1.3 follows and applies to "claims disputes, or other matters" again "arising out of or relat[ing] to [the] Agreement" without reference to specific legal theories. In light of § 8.1.1, interpreting "arising out of or relating to this Agreement" in § 8.1.3 to be limited to contract claims, when claims "arising out of or related to this Agreement" in § 8.1.1 specifically include both contract and tort claims, would be unreasonable. Thus, when read in the context of the Agreement as a whole, the court interprets § 8.1.3 to apply to any claims arising from the Agreement, both contract and tort. It is clear the parties intended to limit damages which may be recoverable for claims arising from or related to the Agreement, no matter the theory of liability. *See Jacobson Warehouse Co., Inc. v. Schnuck Mkts., Inc.*, No. 17-CV-00764-JAR, 2017 WL 5885669, at **4-6 (E.D. Mo. Nov. 29, 2017). Accordingly, the court concludes the Agreement's consequential damages waiver applies to TZMI's contract and tort claims.

Consequential damages "are those damages naturally and proximately caused by the commission of the breach and those damages that reasonably could have been contemplated by the defendant at the time of the parties' agreement." *Cason v. King*, 327 S.W.3d 543, 553 (Mo. Ct. App. 2010) (quoting *Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.3d 812, 818 (Mo. Ct. App. 2008)). Accordingly, to constitute consequential damages, the damages "must have been

reasonably foreseeable to [d]efendant . . . ." *Id.*; Okla. Uniform Jury Instr. 23.53 (foreseeability of special damages); *Atlan Indus., Inc. v. O.E.M., Inc.*, 555 F. Supp. 184, 190 (W.D. Okla. 1983) ("Consequential damages must be foreseeable.").[23]  The question of whether damages are foreseeable is generally a question of fact.  *See Trinity Prods., Inc. v. Burgess Steel, L.L.C.* 486 F.3d 325, 332 (8th Cir. 2007) (applying Missouri law); *Florafax Int'l, Inc. v GTE Mkt. Res., Inc.*, 933 P.2d 282, 292 (Okla. 1997).

It is undisputed that, as late as June of 2014, TZMI did not contemplate any need for loan financing for the project [DSOF ¶ 75].  However, the consequential damage inquiry requires the court to consider what damages "reasonably could have been contemplated by *the defendant* at the time of the parties' agreement."  *Catroppa,* 267 S.W.3d at 818 (emphasis added) (quoting *Ullrich v. CADCO, Inc.*, 244 S.W.3d 772, 779 (Mo. Ct. App. 2008)).  TZMI presents evidence that PGAV understood TZMI's budgetary constraints.  *See* [Doc. 63-10, pp. 66:13 to 67:7].  Further, a reasonable juror could understand that an elevation error would delay construction but that contractors would require payment during that time.  Accordingly, a genuine dispute of material fact exists as to whether PGAV could have contemplated that TZMI would be required to obtain financing and settle with contractors due to construction delays and therefore as to whether TZMI may recover the $50,000 settlement payment to Atlas and financing costs as consequential damages for breach of contract.

---

[23] The requirement flows from general common law principles that permitted recovery of two types of damages in breach of contract cases:  (1) damages that would "naturally and generally result from the breach according to the usual course of things," and (2) "where there are special circumstances . . . damages which result in consequence of the special circumstances . . . if, and only if, the special circumstances were communicated to or known by both parties to the contract at the time they entered into the contract."  *Florafax Int'l, Inc. v GTE Mkt. Res., Inc.*, 933 P.2d 282, 292 (Okla. 1997).  Consequential, or special, damages fall within the second category.

## VI. Conclusion

WHEREFORE, PGAV's Substitute Combined Motion for Summary Judgment and Opening Brief in Support [Doc. 53] is granted in part and denied in part. The motion is granted with respect to TZMI's breach of contract and professional negligence claims to the extent premised on PGAV not selecting NAVD 88 reference datum on its Survey Requirements form. The motion is otherwise denied. The parties are ordered to include briefing directed to choice-of-law with respect to professional negligence and TZMI's claimed damages in their respective trial briefs, due June 10, 2019.

IT IS SO ORDERED this 4th day of March, 2019.

GREGORY K. FRIZZELL, CHIEF JUDGE